SIXTH DIVISION
November 17, 2006

Nos. 1-06-1783 & 1-06-1784 (cons.)

| | | |
|---|---|---|
| In re Daphnie E., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 01 JA 483 |
| | ) | |
| Adeline E. and Jean E., | ) | Honorable |
| | ) | Stephen Y. Brodhay, |
| Respondents-Appellants). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Respondent Adeline E. (Mrs. E.) appeals from an order of the circuit court finding her unfit as a parent as defined in sections 1(D)(b) and (D)(m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(m) (West 2004)) and pursuant to section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 (West 2004)), and terminating her parental rights to her minor child, Daphnie E. Mrs. E. contends the evidence failed to establish that: (1) she failed to maintain a reasonable degree of interest, concern or responsibility for Daphnie's welfare; (2) she failed to make reasonable efforts and progress toward Daphnie's return; and (3) termination of her parental rights was in Daphnie's best interests.

Respondent Jean E. (Mr. E.) appeals from the order of the circuit court finding him unable to discharge parental responsibilities as defined in section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2004)) and pursuant to section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2004)), and terminating his parental rights to Daphnie. Mr. E. contends the evidence failed to establish that: (1) he was unable to discharge his parental responsibilities due to mental illness, impairment or retardation; and (2) termination of his parental rights was in Daphnie's best interests.

-1-

1-06-1783 & 1784 (cons.)

For the reasons that follow, we affirm the judgment of the trial court.

BACKGROUND

When Daphnie was born on February 26, 2001, her five older siblings were in foster care in Florida due to Mr. and Mrs. E.s' history of domestic violence and Mrs. E.'s failure to take her medication for schizophrenia and schizoaffective disorder.[1] Based on the foregoing, and the concern that Mrs. E. had hallucinations during Daphnie's prenatal appointments, Daphnie was taken into protective custody, and the State filed a petition for adjudication of wardship on March 8, 2001. The court appointed the Illinois Department of Children and Family Services (DCFS) as Daphnie's temporary custodian and granted her parents supervised day visitation. Daphnie has lived in the same nonrelative foster home ever since.

In May 2002, the court entered an adjudication order, based on the stipulation of the parties, which found that Daphnie was neglected due to her exposure to an injurious environment.

Respondents' seventh child was born in December 2002, and the Florida court returned three of their children to their care in February 2003. Also in February 2003, the Illinois court made Daphnie a ward of the court and found Mr. and Mrs. E. unable to care for her.

In July 2003, the court entered a permanency order, establishing the goal of Daphnie's return home within 12 months and finding that Mr. and Mrs. E. had made some progress toward the goal. However, in March 2004, the court found that Mr. and Mrs. E. failed to make substantial progress toward the return-home goal and changed the permanency goal to termination of parental rights.

---

[1] According to the record, the E.s' other children are Stephon, born in 1993; Dauphin, born in 1994; Stephanie, born in 1996; Dauphe, born in 1997; Starlenie, born in 1998; Solemn, born in 2002; and Diana, born in 2004.

In July 2004, the State moved to terminate Mr. and Mrs. E.s' parental rights and appoint a guardian with the power to consent to Daphnie's adoption. After amending that petition, the State alleged Mr. and Mrs. E. were unfit under section 1(D)(b) of the Adoption Act for failure to maintain a reasonable degree of interest, concern or responsibility as to Daphnie's welfare; and under section 1(D)(m) of the Adoption Act for failure to make reasonable efforts and progress toward Daphnie's return within nine months from the adjudication of neglect, or within any subsequent nine-month period. The State also alleged Mr. E. was unfit under section 1(D)(p) of the Adoption Act for inability to discharge parental responsibilities because of mental impairment, illness or retardation.

Mr. and Mrs. E.s' eighth child was born in November 2004.

In March 2005, the court maintained the termination-of-parental-rights goal and found that, since March 2004, the parents did not engage in reunification services and did not make substantial progress.

On July 7, 2005, the fitness hearing commenced.

The parties stipulated that licensed clinical psychologist Robert Heller was an expert in clinical psychology. Dr. Heller and an assisting examiner performed a psychological evaluation on Mr. E. in May 2003 to assess his intellectual, behavioral, emotional and academic functioning. Because Mr. E. spoke French Creole and did not speak fluent English, he was tested through an interpreter. Moreover, certain subtests that were highly influenced by language were not administered to Mr. E., who wrote in French Creole at a very preliminary level (kindergarten/first grade). Because Mr. E.'s poorer performance on the verbal rather than the nonverbal testing could have been due to the language barrier, Dr. Heller focused on the nonverbal testing data to take language and cultural sensitivity into consideration.

Dr. Heller testified that Mr. E. tested at the mild end of mental retardation. Academically,

he likely functioned at the first- or second-grade level. He displayed some neurological difficulties, and Dr. Heller found signs of brain damage and referred him for a neurological evaluation. Dr. Heller gave Mr. E. a preliminary diagnosis of narcissistic personality disorder, noting that he displayed a grandiose sense of self, would put his needs first over the needs of his family or other people, and would likely use others to satisfy his own needs. Dr. Heller acknowledged that Mr. E.'s Haitian background consisted of a very paternalistic lifestyle, but thought the extent of Mr. E.'s symptoms was not the result of societal influences rather than a personality disorder.

Dr. Heller testified that, due to Mr. E.'s limited cognitive abilities, he did not seem to understand Mrs. E.'s illness or have any concerns regarding her ability to parent. Interview and test results indicated that Mr. E. did not understand the emotional and developmental variations among children of different ages. Moreover, he was very dependent on Mrs. E., thought she was no longer ill and could now care for their children. Dr. Heller opined that Mr. E. would have difficulties managing his wife and children. Furthermore, depending on the number of children in his care, it would be very difficult for Mr. E. to care for the children without support. Because Mr. E. had difficulty asking for help, it would be difficult for him to seek community support outside of his church and deal with the array of skills needed to care for a number of his children. Test results established that Mr. E. was likely to present himself to others in a favorable light based on his fear of being criticized or rejected. He also tended to suspect other people's motives and was likely to remain emotionally distant from others. He did not seem to have an adequate bond with his children because he tended to feel rejected by them. An in-home observation was recommended to clearly see the type of relationship Mr. E. had with the children.

Dr. Heller opined that Mr. E. suffered more from mental retardation than a mental impairment, given his overall functioning level and adapting skills, and that it would be difficult

for him to learn new materials and new ways of doing things. On standardized tests, Mr E.'s results were in the range of mild mental retardation, but on a nonverbal test, his result was at the borderline intellectual functioning range. Dr. Heller noted that in his report he listed Mr. E.'s AXIS II diagnosis as borderline intellectual functioning, but would now change that diagnosis to reflect more developmental disability or mental retardation given Mr. E.'s overall day-to-day functioning. At the time he wrote the report, Dr. Heller opted for the borderline diagnosis because he was "[b]eing conservative" and he thought it was more "service oriented to provide [Mr. E.] with a mild mental retardation diagnosis." He explained that from a numerical perspective, a full scale IQ score of 100 was average intellectual functioning, the range of 72 to 80 was borderline intellectual functioning, and the range of 55 to 72 was mild mental retardation. Mr. E.'s full scale IQ score of 61 placed him in the mild mental retardation range.

The parties stipulated that licensed neurologist Ian Katznelson was an expert in neurology. He evaluated Mr. E. in September 2003 to determine if there was a medical or neurological reason behind his low IQ score. Dr. Katznelson reviewed Dr. Heller's evaluation when examining Mr. E. Dr. Katznelson studied four years of French in high school and tested out of three years of college French but was not fluent in French. Dr. Katznelson acknowledged that although French Creole was different from French, he occasionally used French when talking to Mr. E., who could follow simple spoken commands, answered many questions in English, and could correctly name objects in English and French. Dr. Katznelson testified that the absence of a French Creole interpreter during Mr. E.'s evaluation did not affect the result because Mr. E.'s difficulties were in the areas of visual/spatial concepts, memory, and cognitive functioning. For example, Mr. E. could not identify simple objects immediately after he had seen them or copy drawings of interlocking shapes. Dr. Katznelson concluded that Mr. E. was mildly mentally retarded, his impairment probably began sometime in childhood, and probably would remain the same. Dr. Katznelson

1-06-1783 & 1784 (cons.)

contacted Mr. E about conducting and MRI exam but never received a response from Mr. E.

Angela Kaufmann, a Catholic Charities case manager, testified she was assigned to this case from July 2001 to March 2004. A January 2002 parenting assessment team (PAT) report was admitted into evidence and established that Mrs. E. was schizophrenic and had three hospitalizations in which she was acutely psychotic. At the time of the PAT evaluation, she was hearing voices, exhibited other psychotic symptoms, and was ambivalent about taking her medication even if she was not pregnant. A fall 2002 assessment indicated that Mrs. E. needed mental health services, including medication monitoring and documentation of her psychiatric appointments, regular visitation with Daphnie, and parenting assessments. Mrs. E. had been seeing her own psychiatrist, Dr. Siemopolous, since 1999 and was receiving two or three medications from him. Regarding Mr. E., he needed parenting assessments and psychological evaluations at the time of adjudication. He consistently participated in weekly supervised visitation with Daphnie. He received satisfactory ratings for his service plans dated September 2001, March 2002, September 2002, and June 2003.

Kaufmann testified that Mrs. E. failed to provide documentation of regular monthly visits with Dr. Siemopolous. Kaufmann received a short, three-sentence, handwritten note dated March 20, 2001; a one-sentence note 14 months later that was dated May 11, 2002; and a four-sentence letter dated April 8, 2003. Despite multiple requests to Dr. Siemopolous, Kaufmann was never able to verify that he wrote those letters, which failed to provide necessary information regarding Mrs. E.'s treatment. Because Mrs. E.'s mental health issues were a primary factor in the case, Kaufmann needed a detailed report regarding Mrs. E.'s status and progress and the nature of her treatment. Moreover, Mrs. E. did not address or accept her diagnosis, avoided discussing her condition, and never provided Kaufmann with documentation of her medication monitoring.

When it was determined that Mrs. E. needed more than a monthly visit to her own

-6-

psychiatrist, Kaufmann referred Mrs. E. to an outpatient day program. Mrs. E. began the program in November 2002, but objected to it, attended less than half of the sessions, and was dismissed from the program on January 30, 2003. Through Kaufmann's efforts, Mrs. E. reentered the program in May 2003, but attended inconsistently and was again dismissed in September 2003. She never returned to outpatient treatment while Kaufmann was on the case. Some of Mrs. E.'s absences were due to the lack of consistent childcare; however, Catholic Charities did not make an earlier referral for childcare because neither Mr. E. nor Mrs. E. indicated that childcare was an issue.

Kaufmann testified that although Mr. E. was required to inform her immediately of any life changes in the home, he failed to tell her that Mrs. E. gave birth to boy in December 2002. Moreover, Mr. E. failed to timely inform Kaufmann that, in February 2003, he picked up three of his five children in foster care in Florida and brought them back to Illinois to live with the E.s. The E.s finally came forward with this information in February 2003. Kaufmann had concerns about the safety of these children because their reunification was not coordinated with Catholic Charities' knowledge.

Kaufmann testified that Mrs. E.'s attendance at weekly supervised visitation with Daphnie was not as consistent as Mr. E.'s attendance. Mrs. E. attended one or two visits a month from May 2002 through early 2004. When Kaufmann learned in February 2003 that the E.s had four children in their care, she encouraged the whole family to attend visits with Daphnie so that Mrs. E. would not need to stay home to care for Daphnie's siblings and Daphnie could spend time with those siblings. Kaufmann also changed the visitation time to make such group visits more convenient. Mrs. E.'s attendance, however, did not improve.

Kaufmann testified that three different reports were made to the DCFS hotline: when the boy was born in 2002, when the three children came home from Florida foster care, and when the

E.s' daughter who lived in the home initiated a report. Kaufmann attempted to monitor the children in the E.s' custody, but they did not have to give her any information or even let her into the home. Kaufmann went to the home every couple of months from February 2003 to March of 2004, and on one visit, Mrs. E. did not allow Kaufmann to enter the home. Kaufmann saw the four children in the home occasionally and, from what she could gather, the E.s seemed to be parenting them well.

Kaufmann testified that the State of Florida had initiated proceedings to terminate Mr. and Mrs. E.s' parental rights to their two children still in foster care in Florida. Between the summer and late 2002, an interstate compact was denied between Florida and Illinois for the E.s' five children to legally and legitimately come to live with their parents in Illinois. Nevertheless, three children were returned to the E.s in Illinois in February 2003. Kaufmann's office was uncertain whether those three children were legitimately returned to the E.s and contacted the Springfield office, which notified the Florida office that the E.s had the children. Kaufmann never received any further information indicating that the children were improperly in the E.s' custody and care.

In late summer or early fall of 2003, Kaufmann gave Mr. E. some paperwork and information regarding State and federally subsidized childcare options through the Department of Human Services, which would have provided childcare services to the E.s for a very small monthly payment. Mr. E. visited those offices once or twice, but the E.s did not obtain day care through the Department of Human Services while Kaufmann was assigned to their case. The E.s were required to provide their own childcare for Daphnie's siblings because they were not wards of the Illinois DCFS.

Carolyn Bell, a case manager at Thresholds, which provides psycho-social rehabilitation services for mentally ill clients, testified consistently with Kaufmann concerning Mrs. E.'s attendance as an outpatient. Bell added that Mrs. E. said she did not need psychotropic medication

and was resistant and hostile about being in services. Although Mrs. E. initially refused psychiatric care, she began treatment with Dr. Mark Baer in June of 2003 and made some progress and was a little more approachable. Mrs. E. indicated her absences were due to difficulty with childcare, and although Bell initially informed Catholic Charities that she did not believe Mrs. E.'s lack of participation was due to childcare difficulties, in July and September of 2003, Bell wrote Catholic Charities that Mrs. E. needed childcare in order to participate successfully in the outpatient program. Bell's letter also stated that Mrs. E. would benefit from learning English as a second language. DCFS, however, determined not to refer Mrs. E. to an English class.

Bell made three or four unannounced home visits when Mrs. E. did not keep program appointments. Bell found the home clean and the children appeared well cared for. Mr. E. was not at home when Bell made her unannounced visits, so she did not have an opportunity to observe him with the children. Due to her failure to attend, Mrs. E. was dropped from the outpatient program even though she was still in need of services.

On behalf of respondents, Mr. E. testified that he was 41 years old, born in Haiti, left school in eighth grade, and had resided in the United States since he was 31 years old. He worked at a hospital doing maintenance work, and previously worked for a restaurant. During 2002 through 2003, he worked five days a week from 4 a.m. to 12:30 p.m. for the restaurant, and worked at the hospital five days a week from 4 p.m. to 11 p.m. He slept five hours per night. At the time of his testimony, he still worked the same hours at the hospital but now worked a different second job five days a week from 5 a.m. to 1 p.m. He denied engaging in domestic violence against Mrs. E., but completed the required domestic violence program and all of the services that the caseworkers requested. He claimed that he spent his own money to pay for the services.

Mr. E. testified that while he worked, Mrs. E. took care of the five children living with them: the three children returned from Florida foster care, the child born in December 2002, and

the child born in November 2004. Furthermore, a State-provided homemaker helped Mrs. E. around the house and accompanied her when the children had appointments. Mr. E. ensured that Mrs. E. took her medication for her illness and thought that she was fine currently because she was seeing a doctor and taking medication. He claimed that Mrs. E. had been taking her medication regularly since 1999. He disciplined the children by taking away their privileges and did not use corporal punishment. He visited Daphnie regularly, but Mrs. E. often stayed home to care for the other children when they came home from school. When Mrs. E. gave birth to a son in 2002, Mr. E. told his attorney and expected the attorney to inform the caseworker. Regarding the information case manager Kaufmann gave him to obtain childcare, Mr. E. stated that he went to the agency and brought all the requested paper work but never received any help from them. Finally, in 2005, DCFS obtained childcare help for the E.s in their home. Mr. E. thought that help was necessary and he appreciated it. According to Mr. E., the helper came to the house for four hours, four days a week.

Sandra Sterlin, a mental health professional at Ada S. McKinley Interventions, testified that she had a bachelor's degree in psychology and had provided individual counseling to Mrs. E. since April 2005. Sterlin's family was from Haiti, and she was familiar with Haitian culture and spoke Creole. She had about 20 sessions with Mrs. E., and Mr. E. participated in less than half of those sessions. Those sessions occurred at the E.s' home every other week for about one hour and addressed issues including coping with depression and the anxiety related to their children's removal. The sessions also addressed the many questions--due to the language barrier--that the E.s had about the system and educated them on their rights. Sterlin noted that the children appeared healthy and well cared for. She did not think Mr. E. exhibited any psychiatric difficulties and thought his interaction with the children in the home was normal. She testified that Mrs. E.'s condition had been stable but did not describe her as making progress. Sterlin acknowledged that

she never met Daphnie or saw her interact with the E.s. Sterlin did not monitor Mrs. E.'s medication and never spoke to either Dr. Heller or Dr. Katznelson about their assessments of Mr. E. Sterlin opined that the parents seemed capable of caring for the children living in their home. She acknowledged, however, that she was not qualified to diagnose mental illness or conduct a parenting assessment, and would defer a diagnosis of mental impairment or mental disability to someone with a degree in clinical psychology.

Glynnis McDonald, an employee in the homemaker program of the Salvation Army Family Services, testified that, since January 2005, she assisted the E.s with household chores and keeping family appointments. Prior to her involvement, the parents had problems with basic appointments, like getting the children to school or to the doctor. She visited the home up to five days a week for between four to eight hours per day. McDonald never saw any unusual incidents in the home, described Mrs. E. as a good housekeeper, and thought the E.s' interaction with their children was always safe and appropriate. She described the E.s' children as well-mannered and very respectful and probably the best children she ever dealt with in her eight years as a homemaker. McDonald never saw Daphnie and acknowledged that the family still needed McDonald's services. McDonald believed that if and when she left the E. home, they would be able to maintain the home on their own.

At the conclusion of McDonald's testimony, the court continued the case for more information of the status of the E.s' two children still in foster care in Florida, and for testimony regarding monitoring of the three children who were returned to the E.s' custody from Florida.

On February 7, 2006, in the State's rebuttal case, Seta Ghazarian, a supervision worker who monitors children who are wards of other states and placed in Illinois through an interstate compact, testified that she was assigned in December 2004 to provide supervision for the three eldest children in the E.s' care. According to Ghazarian, a Florida judge placed those children with

the E.s without any consent from the Illinois agency, without an interstate compact in place, and without a completed home study. Ghazarian explained that she had no involvement with Daphnie's case. Ghazarian visited the E. home monthly to discuss matters regarding the children and her visits lasted one or two hours. Mrs. E. was the primary caretaker for the children, and Mr. E. was in the home about two-thirds of the time during Ghazarian's visits.

Ghazarian obtained in-home therapy for Mrs. E., and another caseworker obtained homemaker services to help Mrs. E. with childcare duties and to make appointments for the children and transport them. In addition, one of the E.s' children began psychiatric counseling. Ghazarian stated that the E.s were not proactive and did not take the initiative to follow through with the services they needed. She did not believe they could function if services were removed because Mrs. E. was inconsistent in taking her psychotropic medication. As recently as November 2005, Ghazarian noticed that Mrs. E.'s medication bottles were empty and reported the matter to the DCFS hotline. Ghazarian also called the DCFS hotline in September 2005 to report that the E.s' daughter said her father sometimes slept with her in the same bed. Ghazarian was concerned about the school performance of the three children she monitored, and about the second eldest child's mental health issues and behavioral problems. Ghazarian did not believe the E.s could adequately care for any more children than were already in their home. In January 2006, the State of Florida filed a petition to terminate the E.s' parental rights to their two children still residing in Florida foster care. Ghazarian could not give an opinion on the quality of the E.s' parenting because her job duties did not include observing their interaction with their children.

On March 13, 2006, the trial court found the State proved by clear and convincing evidence that Mrs. E. was unfit for failure to maintain a reasonable degree of interest, concern or responsibility as to Daphnie's welfare, and for failure to make reasonable efforts to correct the conditions that were the basis for Daphnie's removal or reasonable progress toward Daphnie's

return within nine months after the adjudication of neglect. The court found Mr. E. unable to discharge his parental responsibilities due to his mental impairment, illness or retardation and that his inability to parent would continue beyond a reasonable period of time.

On May 31, 2006, the best interests portion of the termination trial commenced.

Marguerita Coats Hankins, a child welfare specialist at Catholic Charities, testified that she was assigned to Daphnie's case in March 2004. Daphnie had resided in the same nonrelative foster home since shortly after her birth in February 2001. Daphnie had no special needs, did not speak French Creole, and called her foster mother "grandma." The foster mother, who was not of Haitian descent, also cared for her four grandchildren for about 2½ years, since their mother died. The placement was safe and appropriate, and there was never any sign of abuse, neglect or corporal punishment. Hankins described the bond between Daphnie and the foster mother as very close, like that between a parent and her child. Moreover, Daphnie had a very close sibling-type relationship with the foster mother's four grandchildren. The foster mother loved Daphnie, considered her to be a member of the family, and wanted to make her a permanent family member.

Hankins testified that the E.s were entitled to monthly supervised visits with Daphnie, but the frequency of their actual visits was sporadic, occurring every two or three months. Mr. E. visited Daphnie more frequently, but the E.s usually attended together. Daphnie's biological siblings attended the visits about twice in the last two years. Daphnie did not call Mrs. E. "mom," and her relationship with her biological siblings was not close. The E.s brought snacks to the visits and their interaction with Daphnie was very appropriate. Daphnie appeared happy to see them but sometimes asked Hankins during visits if it was time to go home yet.

Gwendolyn Jones Kelly, a family aide at the Salvation Army, testified that she had been assigned to the E. family since February 2006. She was in the E. home three hours per day, three days per week, and was responsible for demonstrating how to keep a household, prepare meals,

watch the children, and other basic parenting duties. Kelly never observed the E.s interact with Daphnie, but thought the E.s' interaction with their children at home demonstrated a good relationship and adequate parenting abilities. Kelly saw an improvement in the E.s' ability to manage their home and children. She did not know how much longer her services would be needed and believed the E.s could manage on their own.

Mr. E. testified that he currently worked only one job, doing maintenance work at a hospital. When he was home, he was active with his children, feeding them, playing with them, taking them to the park, doing their hair, and taking them to church. He testified that he already knew how to do the homemaker tasks before the homemaker services were placed in his home. He appreciated the homemaker's help but thought he and Mrs. E. could care for their children, including Daphnie, themselves. Prior to March 2004, he visited Daphnie regularly every two weeks in the late afternoon. When the goal changed from "return home" to "termination of parental rights," the caseworker reduced the visits to once a month. When Mr. E.'s work schedule changed, he contacted caseworker Hankins to reschedule the visits for earlier in the day, but either she did not return his telephone calls or Daphnie was not at the visit location at the scheduled time. Furthermore, his monthly visits with Daphnie were interrupted due to his hospitalization from March 1 through April 8, 2006, and his court appearance regarding his children in Florida foster care. During visits, he stated that Daphnie called him "papa" and Mrs. E. "mommy." He wanted Daphnie and believed that he and Mrs. E. had a parental bond with Daphnie and were capable of taking care of her.

On May 31, 2006, the court found that the State had proved by a preponderance of the evidence that it was in Daphnie's best interests to terminate both Mr. and Mrs. E.s' parental rights and appoint a guardian with the right to consent to Daphnie's adoption. The E.s timely appealed.

ANALYSIS

-14-

The State must prove by clear and convincing evidence that a respondent was an unfit parent. In re D.F., 201 Ill. 2d 476, 494-95 (2002). A trial court's finding of unfitness is afforded great deference because it has the best opportunity to view and evaluate the parties and their testimony; the trial court's finding will not be disturbed on appeal unless it is against the manifest weight of the evidence. In re D.F., 201 Ill. 2d at 498-99. A decision is against the manifest weight of the evidence where the opposite result is clearly evident from the record. In re D.F., 201 Ill. 2d at 498. Each case concerning parental unfitness is sui generis, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value. In re T.D., 268 Ill. App. 3d 239, 245 (1994). A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act. In re D.D., 196 Ill. 2d 405, 422 (2001).

*Failure to Maintain a Reasonable Degree of Interest, Concern or Responsibility*

Mrs. E. contends the trial court's finding that she failed, pursuant to section 1(D)(b) of the Adoption Act, to maintain a reasonable degree of interest, concern or responsibility for Daphnie's welfare was against the manifest weight of the evidence.

In determining whether a parent has shown a reasonable degree of interest, concern or responsibility for a child's welfare, courts consider a parent's efforts to visit and maintain contact with the child, as well as other indicia of interest, such as inquiries into the child's welfare. In re Adoption of Syck, 138 Ill. 2d 255, 278-79 (1990). The interest, concern or responsibility must be objectively reasonable. In re M.J., 314 Ill. App. 3d 649, 657 (2000). Moreover, courts consider a parent's conduct in the context of the circumstances in which it occurs, including any difficulty in obtaining transportation to the child's residence, the parent's poverty, conduct of others that hinders visitation, and the motivation underlying the failure to visit. In re Adoption of Syck, 138 Ill. 2d at 278-79. However, a parent need not be at fault to be unfit, and she is not fit merely because she

had demonstrated some interest in or affection for her child. In re E.O., 311 Ill. App. 3d 720, 727 (2000). If personal visits were somehow impractical, courts consider whether a reasonable degree of concern was demonstrated through letters, telephone calls, and gifts to the child, taking into account the frequency and nature of those contacts. In re Adoption of Syck, 138 Ill. 2d at 279. Completion of service plan objectives can also be considered evidence of a parent's concern, interest, and responsibility. In re Jaron Z., 348 Ill. App. 3d 239, 259 (2004); In re T.Y., 334 Ill. App. 3d 894, 906 (2002); In re M.J., 314 Ill. App. 3d at 657; In re E.O., 311 Ill. App. 3d at 727-28. Courts will consider the parent's efforts which show interest in the child's well-being, regardless of whether those efforts were successful. In re Adoption of Syck, 138 Ill. 2d at 279.

Mrs. E. acknowledges that she was entitled to weekly supervised visits with Daphnie but was present for only one or two visits per month. She claims she was unable to attend visits because she had to stay home and care for Daphnie's siblings and the agency failed to provide financial assistance and childcare. She also claims that the agency failed to refer her to a class in English as a second language. She argues that her actions in the face of those hurdles were reasonable. We disagree.

The record establishes that the E.s withheld from the agency the information that they had children in their custody. When Daphnie was adjudicated neglected in May 2002, no children were living in the E.s' home until Mrs. E. gave birth to a boy in December 2002 and Mr. E. brought three of their children to Illinois from Florida in February of 2003. Despite clear warnings in their service plans to notify their caseworker in the event of another pregnancy or any other lifestyle change, Mrs. E. denied her pregnancy when questioned, and the E.s did not come forward with the information that four children were in their home until after the fact in February 2003. Consequently, case manager Kaufmann and Catholic Charities did not timely learn about the children and could not coordinate the family's reunification. Catholic Charities did, however,

contact the appropriate state agency to report the reunification and ascertain whether the children were properly returned to the E.s from Florida foster care. Furthermore, the E.s did not raise the issue of childcare difficulties until the late summer or fall of 2003. At that time, Kaufmann gave Mr. E. information regarding obtaining subsidized childcare, encouraged the whole family to attend visits with Daphnie, and changed the visitation time to make such group visits more convenient. Nevertheless, Mrs. E.'s attendance did not improve, and she failed to notify the caseworker when she was going to miss a visit.

In addition to inconsistent visitation with Daphnie, Mrs. E. failed to acknowledge and fully deal with her mental health issues, was noncompliant about taking her psychotropic medication as recently as November 2005, failed to provide adequate documentation of any treatment by her private physician, and failed to attend an outpatient mental health treatment program. The trial court properly relied on that relevant information to find Mrs. E. unfit for failure to maintain a reasonable degree of interest, concern or responsibility toward Daphnie's welfare because Mrs. E. failed to engage in necessary mental health services aimed at ensuring Daphnie's safety while in her care. See In re M.J., 314 Ill. App. 3d at 656 (despite consistent visits with her child, the mother was unfit under ground 1(D)(b) where she failed to substantially comply with service plan directives that included participation in mental health services).

We also reject Mrs. E.'s contention that the agency's decision not to refer her to language classes somehow negatively affected her ability to visit Daphnie or comply with service plan directives. Given Mrs. E.'s numerous absences from visits and outpatient therapy, the additional requirement of attending language classes would not have aided her accomplishment of service plan directives.

*Failure to Make Reasonable Efforts or Progress*

Mrs. E. contends the trial court's findings of unfitness under subsections 1(D)(m)(i) and

(D)(m)(ii) of the Adoption Act were against the manifest weight of the evidence. Specifically, she argues that she complied with the need for mental health monitoring by seeing her own psychiatrist, complied with the parenting assessments, completed a parenting class, and engaged in outpatient services but had absences due to her difficulty in obtaining childcare assistance.

Section 1(D)(m) of the Adoption Act contains three separate grounds, any one of which may uphold a finding of parental unfitness. Subsection (i) deals with a parent's failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child; subsection (ii) deals with a parent's failure to make reasonable progress toward the return of the child within nine months after an adjudication of the child as abused, neglected or dependent; and subsection (iii) deals with a parent's failure to make reasonable progress toward the return of the child during any nine-month period after the end of the initial nine-month period following the adjudication of the child as abused, neglected or dependent. 750 ILCS 50/1(D)(m) (West 2004). Subsections (i) and (ii) are to be examined for only the first nine months after the adjudication, whereas subsection (iii) may be examined for any nine-month period following the expiration of the initial nine months after the adjudication. See In re D.F., 208 Ill. 2d 223, 237-38 (2003).

Reasonable *efforts* and reasonable *progress* are two different grounds for finding a parent unfit in section 1(D)(m). Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent (750 ILCS 50/1(D)(m)(i) (West 2004)), and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person (In re Allen, 172 Ill. App. 3d 950, 956 (1988)). In contrast, reasonable progress is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. Allen, 172 Ill. App. 3d at 956. At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification. Allen, 172 Ill. App. 3d at 956. The benchmark for measuring a parent's progress

1-06-1783 & 1784 (cons.)

under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known and would prevent the court from returning custody of the child to the parent. In re C.N., 196 Ill. 2d 181, 216-17 (2001). Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future. In re L.L.S., 218 Ill. App. 3d 444, 461 (1991).

Because Mrs. E. was found unfit under subsections 1(D)(m)(i) and (D)(m)(ii), the applicable initial nine-month period following adjudication runs from May 13, 2002, through February 13, 2003.

The evidence offered at the fitness hearing was set forth in detail above and clearly and convincingly established that Mrs. E. failed to make both reasonable efforts and progress during the first nine months following adjudication. She was schizophrenic and had at least three psychiatric hospitalizations in which she was in acute psychotic states. According to her January 2002 PAT evaluation, she was hearing voices, exhibiting some evidence of continuing psychotic symptomatology, gave inconsistent answers regarding her current compliance with taking her medication, and admitted that she stopped taking her medication in the past even when she was not pregnant.

When Daphnie was adjudicated neglected in May 2002, Mrs. E. still needed a variety of mental health services, including medication compliance, medication monitoring, psychiatric treatment, and documentation of the psychiatric treatment. She also needed to maintain regular visitation with Daphnie and complete a follow-up PAT reassessment. Contrary to Mrs. E.'s assertions, the State proved by clear and convincing evidence that she failed to comply with the directives concerning mental health services, monitoring and documentation. Mrs. E. insisted on continuing treatment with her preferred psychiatrist, Dr. Siemopolous, and case manager

-19-

Kaufmann attempted to honor that choice and work with them. However, Dr. Siemopolous's three untimely, vague and brief letters failed to give Kaufmann necessary information concerning Mrs. E.'s condition, treatment plan, and progress--if any. Despite Kaufmann's attempts to contact Dr. Siemopolous, Kaufmann could not even confirm the authenticity of the three letters.

As a result, Kaufmann referred Mrs. E. to an outpatient day program for her mental health needs in the fall of 2002. Mrs. E., however, objected to the program, attended less than 50% of the sessions between November 2002 and January 2003, and refused to see the psychiatrist. She was dismissed unsuccessfully from the program in January 2003, did not re-enroll until well after the expiration of the initial nine-month period following adjudication, and was again dismissed unsuccessfully from the program. Moreover, Mrs. E.'s PAT reassessment still listed concerns about her mental illness, continued minimization of her mental illness, lack of insight into her mental illness, ambivalence about taking her medication, and resistence to the outpatient program that could have been beneficial to her.

From roughly May 2002 to February 2003, Mrs. E. failed to engage in service plan directives related to her mental health diagnoses, including cooperating with outpatient therapy, acknowledging her mental illness, and completing and providing documentation of mental health services, including taking psychotropic medications. We have carefully reviewed the record and find that the State proved by clear and convincing evidence that Mrs. E. failed to make reasonable efforts and progress and that an opposite conclusion is not clearly evident. Accordingly, we conclude that the trial court's finding that Mrs. E. was unfit under subsections 1(D)(m)(i) and (D)(m)(ii) was not against the manifest weight of the evidence.

*Unable to Parent Due to Mental Impairment, Illness or Retardation*

Mr. E. challenges the trial court's finding of unfitness under section 1(D)(p) of the Adoption Act. Specifically, he argues that the evidence demonstrated that he was already

successfully parenting five other minor children.

In order to find a parent unfit under section 1(D)(p), competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist must show the parent suffers from a mental disability that prevents him from discharging parental responsibilities, and there must be sufficient justification to conclude that the inability will extend beyond a reasonable period of time. 750 ILCS 50/1(D)(p) (West 2004); In re C.M., 319 Ill. App. 3d 344, 360 (2001).

The record supports the trial court's finding of unfitness, and Mr. E. fails to establish that the court's ruling was against the manifest weight of the evidence. Expert witness Dr. Heller testified, based on a reasonable degree of psychological certainty, that Mr E. suffered from mental retardation and a narcissistic personality disorder (rule-out diagnosis) and he would have difficulty functioning independently as a parent, and the difficulty would last beyond a reasonable period of time. Dr. Heller evaluated Mr. E. with the use of an interpreter and did not administer certain tests that were highly influenced by language. Dr. Heller testified that intellectually Mr. E. tested at the mild mental retardation range, but scored at the low borderline range of intelligence on standardized tests administered visually and nonverbally. His overall IQ tested at 61 and his academic skills were at the first- or second-grade level. Despite one test showing borderline intellectual functioning, other tests showed mild mental retardation, and Dr. Heller changed the AXIS II diagnosis to reflect more developmental disability or mental retardation given Mr. E.'s overall functioning. Moreover, although the rule-out diagnosis of narcissistic personality disorder indicated that there were additional tests that could have been done, Dr. Heller testified that he was confidant of that diagnosis.

Expert witness Dr. Katznelson testified that, based on a reasonable degree of neurological certainty, Mr. E. suffered from mild mental retardation that probably began in childhood and would remain the same. Mr. E. attacks Dr. Katznelson's opinion due to the absence of any

translator during the evaluation. However, Dr. Katznelson testified that a translator was not necessary because he obtained Mr. E.'s history from Dr. Heller's report and could speak to Mr. E. using English and some basic French. Moreover, Mr. E. could give short answers in English or French and demonstrated that he understood simple requests, like "copy this picture."

In addition to the expert testimony, the trial court also considered the testimony of nonexperts regarding their opportunity to observe Mr. E. and his capacity to parent. See In re T.J., 319 Ill. App. 3d 661, 670 (2001) (nonexperts who have had an opportunity to observe a person may give their opinions of mental condition or capacity based on facts observed, and such lay opinions may overcome an expert opinion), *rev'd on other grounds,* 202 Ill. 2d 282 (2002). Case manager Kaufmann's testimony contained no opinion regarding Mr. E.'s mental state that was contrary to the experts' opinions. Moreover, she had little opportunity to observe Mr. E. parenting the children in the home. Sterlin, who was in the home for about one hour, twice a month for individual counseling usually with Mrs. E., testified that she did not think Mr. E. exhibited any psychiatric difficulties and thought his interaction with the children in the home was normal. However, Sterlin acknowledged that Mr. E. was present for less than half of the counseling sessions and she would defer a diagnosis of mental illness or mental disability to someone who held a degree in clinical psychology. Furthermore, McDonald, the homemaker assigned to the E. home, did not give an opinion regarding Mr. E.'s mental condition and testified that Mrs. E. was the primary caregiver whereas Mr. E. was not home much of the time.

The record supports the trial judge's decision that the lay opinions did not overcome the experts' opinions regarding Mr. E.'s mental condition or capacity, his ability to learn new things and function independently as a parent, or his prognosis. The nonexperts did not have a sufficient opportunity to observe Mr. E.'s parenting ability, where he worked about 17 hours a day, usually was not at home, and Mrs. E. was the primary caregiver. According to Mr. E.'s testimony, he was

home for only seven hours a day, from about 12:30 p.m. to 3:30 p.m., and 11 p.m. to 4 a.m., not including any travel time.

Furthermore, the record does not support Mr. E.'s contention that he demonstrated his parental fitness with evidence that he was successfully parenting his other children. Although prior cases have held that testimony regarding a parent's ability to care for another child was not relevant to the issue of the parent's fitness concerning the minor at issue in the termination proceedings (In re R.M., 219 Ill. App. 3d 747, 752 (1991); In re M.C., 201 Ill. App. 3d 792, 798 (1990)), this court recently ruled that evidence that a father was found fit and awarded custody of four of the minor's siblings was material, relevant and one factor the trial court should have considered in determining the father's fitness and ability to parent the minor (In re L.W., No. 1-03-2835, slip op. at 20 (September 21, 2006), *pet. for leave to appeal pending* No. 103620). Citing basic principles regarding the admissibility of relevant evidence, the court in In re L.W. found the fitness findings concerning the minor's siblings probative because it tended to prove or disprove a matter at issue in the case. In re L.W., No. 1-03-2835, slip op. at 19-20. We agree with the analysis of the court in In re L.W. and find that the trial court here properly considered evidence concerning Mr. E.'s ability to parent his other children.

That evidence, however, did not demonstrate that Mr. E. was adequately and successfully parenting those children. Ghazarian, the supervision worker monitoring the three E. children in Illinois who were wards of the State of Florida, testified that those children were placed in the E.s' custody without her agency's consent, without an interstate compact in place, and without a completed home study. Ghazarian was concerned about their school performance and tardiness. One boy had mental health issues and behavioral problems and began psychiatric counseling. Moreover, the E.s required State services to help with childcare duties and to make appointments for the children and transport them. Ghazarian testified that the E.s were not proactive and did not

take the initiative to follow through with the services they needed. Ghazarian stated the E.s could not function properly and care for the five children in their home without the help of both the homemaker and counselor because Mrs. E. would not remain consistent in taking her medication. Moreover, the State of Florida began proceedings to terminate the E.s' parental rights to their two children still residing in Florida foster care.

Mr. E. testified that Mrs. E. could care for their children now because she was fine, was seeing her doctor and taking her medication, and had been taking her medication since 1999. In contrast, Ghazarian testified that Mrs. E. was not compliant with taking her medication as recently as November 2005. Moreover, Kaufmann's testimony established Mrs. E.'s failure to comply with service plan directives to treat her mental illness and provide documentation of that treatment. The trial judge noted that the fact that Mrs. E., the primary caregiver, ran out of her medication and the E.s needed help refilling her prescriptions indicated that Mr. E. did not have a good grasp of what was going on in the home.

We find the trial court properly concluded that there was not sufficient evidence to overcome the expert testimony that Mr. E. was unable to discharge his parental responsibilities due to mental impairment, illness or retardation, and that sufficient justification existed to believe that the inability would extend beyond a reasonable time period.

*Best Interests Determination*

The E.s also contend that the trial court's decision to terminate their parental rights was against the manifest weight of the evidence where Daphnie addressed them as her parents, they interacted appropriately during visits, and childcare arrangements for their other children interfered with the frequency of their visits.

If the trial court finds a parent unfit by clear and convincing evidence on one or more statutory grounds under the Adoption Act, the trial court then conducts a second, bifurcated

proceeding that focuses on whether termination of parental rights and allowance of an adoption petition would be in the child's best interests. In re Adoption of Syck, 138 Ill. 2d at 277. At a termination hearing, the focus is on the child's welfare and whether termination would improve the child's future financial, social, and emotional atmosphere. In re D.M., 336 Ill. App. 3d 766, 772 (2002). When determining whether termination of parental rights is in a child's best interests, a court must consider the following factors in the context of the child's age and developmental needs: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3 (4.05) (West 2004).

The State must prove by a preponderance of the evidence that termination is in the child's best interests. In re D.T., 212 Ill. 2d 347, 366 (2004). If the admission or denial of evidence during the hearing is at issue on appeal, the trial court's judgment is reviewed for an abuse of discretion. In re D.M., 336 Ill. App. 3d at 773. However, when the sufficiency of the evidence presented at the termination hearing is challenged on appeal, the appropriate method of review is the manifest weight standard. In re D.M., 336 Ill. App. 3d at 773. Here, the appropriate question is whether the court's decision was against the manifest weight of the evidence. A decision is considered to be against the manifest weight of the evidence if the facts clearly demonstrate that the court should have reached the opposite conclusion. In re D.M., 336 Ill. App. 3d at 773.

The evidence presented at the best interests hearing was more than sufficient to support the

trial court's determination that termination of the E.s' parental rights was in Daphnie's best interests. Daphnie, who has never lived the E.s, will be six years old in February 2007. She was a newborn when she was removed from their care and placed with her current foster parent. Mrs. E. did not attend the weekly, supervised visits at the agency consistently, and when the visits were reduced to monthly, the E.s attended sporadically. They last visited Daphnie in December 2005 and February 2006 before the May 2006 best interests hearing. The E.'s brought snacks to the visits and their interaction with Daphnie was appropriate, and she appeared happy to see them, called Mr. E. "papa" and may have called Mrs. E. "mommy." However, there was little evidence that Daphnie had a strong bond with the E.s. Although the caseworker encouraged the E.s to bring Daphnie's biological siblings to the visits, Daphnie only saw those siblings about three or four times--their last visit was several months before the best interests hearing--and the evidence did not indicate that she had a close relationship with them.

Daphnie has resided in the adoptive foster home for over 5½ years, and the record established that the environment was safe, appropriate and nurturing. She was an integral part of her adoptive family, which consisted of the foster mother and her four grandchildren. Daphnie called her foster mother "grandma," just as the other children in the home did. Caseworker Hankins testified that Daphnie had a close relationship with her foster siblings and foster mother, and the foster mother loved Daphnie and wanted to adopt her to make her officially part of her family.

We find that the State proved by a preponderance of the evidence that termination of the E.s' parental rights was in Daphnie's best interests. The opposite conclusion was not clearly evident. Therefore, the trial court's decision to terminate the E.s' rights was not against the manifest weight of the evidence.

Accordingly, we affirm the judgment of the circuit court.

1-06-1783 & 1784 (cons.)

Affirmed.

JOSEPH GORDON and McNULTY, JJ., concur.