**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200382-U

Order filed February 25, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* A.N., | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| a Minor | ) | LaSalle County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-20-0382 |
| | ) | Circuit No. 18-JA-5 |
| v. | ) | |
| | ) | |
| M.P., | ) | |
| | ) | Honorable Cynthia Raccuglia, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice McDade and Justice Holdridge concurred in the judgment.

**ORDER**

¶ 1      *Held*: The evidence supported the trial court's finding that respondent was unfit and that terminating respondent's parental rights was in the best interests of the minor.

¶ 2      Respondent, M.P., appeals from an order finding him unfit and terminating his parental rights. He challenges the trial court's finding that he was an unfit parent as well as its decision to terminate his parental rights. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          On April 2, 2018, the State filed a petition for adjudication of wardship regarding the minor,

A.N. The petition alleged that A.N.'s biological mother, J.N., and biological father, respondent.,

were unfit parents. The petition was based on the allegation that the minor's grandmother, N.H.

(J.N.'s mother), was intoxicated when she brought A.N. to the doctor for his one-year checkup.

N.H. had previously overdosed on drugs three times. At the time of the filing of the petition,

respondent did not know that he was A.N.'s biological father.

¶ 5          The State later amended the petition to allege that A.N. was in an injurious environment.

At the time of the proceedings, respondent was serving a 16-year sentence as a result of drug-

related convictions. A.N.'s mother, J.N., was serving parole at the time for drug-related charges.

J.N. ultimately did not participate in the proceedings.[1]

¶ 6          Ultimately, the trial court found that A.N. was neglected and that respondent was an unfit

parent. The court, therefore, made A.N. a ward of the court and appointed the Department of

Children and Family Services (DCFS) as the guardian. The court also ordered DCFS to develop a

permanency goal and service plan for the minor.

¶ 7          Subsequently, the State filed a petition to terminate respondent's parental rights. The

petition alleged that respondent was an unfit parent in that he failed to maintain a reasonable degree

of interest, concern, or responsibility as to A.N.'s welfare. The petition further alleged that

respondent failed to correct the conditions or make reasonable progress toward the return of A.N.

during the nine-month period following the adjudication of A.N. as abused or neglected.

¶ 8          The hearing on the petition was held in two-parts, the first hearing related to respondent's

fitness to be a parent and the second hearing considered whether to terminate respondent's parental

_____

[1]J.N. was ultimately defaulted for failing to appear and her parental rights were terminated.

rights. At the fitness hearing, the child specialist caseworker for DCFS, Angie Miller, testified. Miller stated that respondent's compliance with the service plan she developed was unsatisfactory. She noted that respondent was incarcerated for drug-related charges when A.N. came into DCFS's care. Respondent was serving a 16-year sentence with the possibility of parole in 2026. Miller provided respondent with a service plan and explained the plan to him while he was incarcerated. The service plan required respondent to find adequate housing, employment, parenting, mental health, and substance abuse services. Respondent failed to complete any classes to address his substance abuse problems. Additionally, respondent failed to participate in mental health treatment services. Respondent did participate in in-person visits with A.N. while incarcerated, but those visitations ended when restrictions were put in place due to the pandemic.

¶ 9 Miller did not believe that A.N. bonded with respondent because the initial visits were "through glass" and A.N. was an infant. Miller did not believe that respondent could care for A.N. because he will remain in prison for at least six more years and he had failed to satisfactorily complete the services outlined in the service plan.

¶ 10 On cross-examination, Miller explained that the housing and employment requirements of the service plan were unavailable due to respondent's incarceration. Miller also testified that respondent said he was on a waiting list for substance abuse treatment. Miller contacted respondent's prison counselor regarding the services, but she was unable to obtain any information whether respondent could complete the required services. She did not know if respondent had completed courses called "Coping with Grief and Loss" and "Beyond Criminal Thinking," while incarcerated. Respondent never told Miller that he had completed those courses.

¶ 11 Miller also explained that she attempted to facilitate video visits between A.N. and respondent, but video visits had to be initiated through respondent or his family. In addition, A.N.

had met respondent's other children and had attended visits at respondent's mother's home. Miller testified that respondent had maintained little, if any, contact with A.N. throughout the course of the proceedings.

¶ 12    Respondent testified that he was currently incarcerated with a projected parole date in 2026. He discussed his service plan and went over its requirements with Miller. Respondent could not participate in substance abuse programs because such programs were not offered by the facility that he was in. However, he was on a waiting list for a substance abuse program. Respondent also began a parenting program as required, but the program was suspended due to the pandemic. To satisfy the mental health requirement of the service plan, respondent had taken a two-part class regarding criminal thinking. Respondent also participated in a program regarding coping with grief.

¶ 13    Respondent testified that he loved A.N. When A.N. visited him, they would color or play with toys. Respondent also tried to hold him as much as he could during the visits.

¶ 14    Respondent did not participate in video visits with A.N. He was not allowed to initiate video visits on his own. The person that wanted to participate in the video visit would have to initiate the visit. However, respondent never asked to have any video visits with A.N.

¶ 15    Respondent acknowledged that he did not personally observe any interactions between A.N. and his other children. Nevertheless, he believed that his other children enjoyed being siblings with A.N. and would play together. Respondent also stated that his mother loved A.N. and that A.N. called her "mama," but he never personally observed the two interacting.

¶ 16    On cross-examination, respondent explained that he did not know he was A.N.'s father until the original neglect proceedings began. He never had overnight visits with A.N. Respondent

never successfully completed a parenting class while incarcerated. Respondent claimed that he had housing available in Chicago upon release but never relayed that information to Miller.

¶ 17        After hearing the evidence, the trial court found respondent unfit due to respondent's "own wrongdoing" and "choices." The court found that respondent was unable to make reasonable efforts to comply with DCFS and the requirements of the service plan. The court found that due to respondent's long-term incarceration, he was unfit to care for A.N.

¶ 18        The cause then proceeded to a hearing as to the termination of respondent's parental rights and the best interests of A.N. At the hearing, Miller testified as follows. A.N. had been placed in a foster home for 2½ years since he was one year old. A.N. was thriving in the foster home; the foster parents were willing to adopt A.N. The foster mother stays home with A.N. so that A.N. did not have to go to daycare. Miller described A.N.'s foster placement as full of A.N.'s toys. The home is child proofed and A.N. is bonded with his foster parents. A.N.'s foster parents are accepting; they adored A.N. since the day they first met him. A.N. thrived and met all his milestones in their care. The foster parents signed a permanency commitment and wished to adopt A.N. Therefore, Miller recommended that the goal be changed to adoption upon the termination of respondent's parental rights as she believed it was in A.N.'s best interests to remain with his foster family.

¶ 19        Miller did consider respondent's mother as a possible placement for A.N. Miller did not believe there was enough room in the grandmother's home to accommodate A.N. Therefore, she did not believe her home was suitable for A.N. Miller also observed open wires and hazards in the home, and that the home did not have a bedroom for A.N. The grandmother told Miller that A.N. could sleep with her in her room, but DCFS did not allow such a situation. After Miller met

respondent's grandmother, she did not hear from her for four months, at which time A.N. had already bonded with his foster parents.

¶ 20 The only parents A.N. has known are his foster parents. A.N.'s foster parents have an excellent relationship with A.N., keep him up to date on his medical care, immunizations, and inoculations. A.N. vacationed with his foster parent's extended families. The foster parents also never leave A.N. with a babysitter.

¶ 21 Respondent completed an integrated assessment for DCFS. The assessment showed the following information. Respondent had seven or eight arrests as a juvenile. As an adult, he was arrested for delivery of cocaine and served a 2½-year prison sentence. Respondent had his first child at the age of 14. Respondent had four children in total with three different mothers. However, respondent did not parent any of the children on a day-to-day basis. He also never paid child support or had stable employment. Instead, he supported himself through "hustling." He refused to explain what he meant by that, but the assessment concluded that the money was made through the sales of illegal drugs. Although he stated that he saw the children almost daily prior to his incarceration, that information was never verified. When respondent was not on parole, he ingested marijuana and smoked "4-5 blunts per day." Due to his incarceration, he could not act as a parent to his other children; his other children are supported by their respective mothers.

¶ 22 Respondent testified that he communicated with his grandmother and she told him that she was willing to care for A.N. Respondent acknowledged that various people live in his grandmother's home, but he believed that a room would be available for A.N. Respondent did not know if A.N. could discern who his cousins were, but he thought that A.N. would enjoy spending time with them. Respondent also did not know of A.N.'s wishes due to A.N.'s young age. Respondent stated that he loves A.N. and wants him to know his siblings.

¶ 23 Respondent explained that his mother also cared for his sister's children. Respondent also stated that his five other children live with their respective mothers. According to respondent, A.N. did not have a relationship with his other children who lived outside Chicago. Respondent believed it was in the best interests of A.N. to grow up with his siblings, even though respondent's other children live in other households.

¶ 24 Ultimately, the trial court found that it was in A.N.'s best interests to terminate respondent's parental rights. The court also found that it was in A.N.'s best interests to be placed for adoption by his foster parents.

¶ 25                                II. ANALYSIS

¶ 26 On appeal, respondent challenges the trial court's fitness finding as well as its decision to terminate his parental rights. First, respondent contends that the State failed to meet its burden in proving his parental unfitness. The State must prove parental unfitness by clear and convincing evidence, and the trial court's findings must be given great deference because of its superior opportunity to observe the witnesses and evaluate their credibility. *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004). We will not reverse a trial court's finding of parental unfitness unless it was contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). A finding of parental unfitness may be based on evidence sufficient to support any one statutory ground. *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 27 The trial court found that respondent failed to make reasonable efforts and progress toward correcting the conditions that led to the removal of A.N. Reasonable efforts and reasonable progress are two different grounds for finding a parent unfit. See *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066 (2006). "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent [citation], and are judged by a subjective standard

based upon the amount of effort that is reasonable for a particular person [Citation.]" *Id*. at 1066-67. However, the legislature did not include an exception to this rule for parents that are incarcerated. See generally, *In re J.L.*, 236 Ill. 2d 329, 340 (2010). Therefore, incarceration is not an excuse for failing to make reasonable efforts.

¶ 28        Reasonable progress, unlike reasonable efforts, "is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. Reasonable progress requires, at a minimum, "measurable or demonstrable movement toward the goal of reunification." *Id.* Like reasonable efforts, the legislature included no exception to this rule for incarcerated parents. See generally, *In re J.L.*, 236 Ill. 2d at 340. In determining whether a parent has made reasonable progress toward the return of the child, courts are to consider evidence occurring only during the relevant nine-month time period in section 1(D)(m). See *In re D.L.*, 191 Ill. 2d 1, 10 (2000). Therefore, the fact that respondent is incarcerated is no excuse for failing to make reasonable progress.

¶ 29        "The benchmark for measuring a parent's progress under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known and would prevent the court from returning custody of the child to the parent. [Citation.] Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future. [Citation.]" *In re Daphnie E.*, 368 Ill. App. 3d at 1067. Where a minor is no closer to being returned to a parent's custody than at the time of removal from custody, reasonable progress has not been made. *In re D.J.S.*, 308 Ill. App. 3d 291, 295 (1999).

¶ 30    Upon our review, the trial court reasonably concluded that respondent failed to make both reasonable efforts and progress toward correcting the conditions that led to A.N.'s removal. The service plan required respondent to: (1) find adequate housing, (2) find employment, and (3) participate in mental health, parenting, and substance abuse programs. Despite having the service plan explained to him, he did not complete services during the relevant nine-month period. Although respondent claimed that he would live with his mother upon release, there is no evidence that the housing would accommodate A.N. He also did not secure employment. During the nine-month period, respondent also failed to complete any classes for substance abuse treatment and did not take any mental health treatment. While we recognize respondent's claim that he could not secure employment or participate in mental health, substance abuse, and parenting classes because of his incarceration, we note that respondent's current circumstances are the result of his own decisions. Under the circumstances of which respondent is fully responsible, he made no measurable or demonstratable movement toward the goal of reunification. Therefore, the trial court did not err when it found him to be unfit.

¶ 31    Second, respondent contends the trial court erred when it found that the best interests of A.N. were furthered by terminating respondent's parental rights and placing A.N. for adoption by his foster parents. A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 32     At the best-interests phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of a minor. *Id.* at 366; *In re Deandre D.*, 405 Ill. App. 3d 945, 953 (2010). Section 1-3(4.05) of the Juvenile Court Act of 1987 sets forth various factors for the trial court to consider in assessing a minor's best interests. These considerations include: (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) the minor's familial, cultural, and religious background; (4) the minor's sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes and goals; (6) community ties; (7) the minor's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 33     We find the statutory factors overwhelmingly favor a finding that it was in A.N.'s best interests to terminate respondent's parental rights. To begin with, respondent already fathered three children with two other women. He failed to act as a parent to any of those children. He also never paid child support for those children. Given this, he is unlikely to provide any support for A.N. Further, at the time of the proceedings, respondent was incarcerated. There is no indication that respondent would become fit or able to care for A.N. until at least 2026, at which time he would be eligible for parole. However, A.N. had been placed in his foster home for 2½ years by the conclusion of the proceedings. By the time respondent is eligible for parole, A.N. would have spent more than eight years with his foster family. The foster family provided for the physical safety and welfare of A.N., including food, shelter, clothing, and healthcare. A.N. was thriving in his foster home and was meeting all his milestones. His foster mother stayed home to care for A.N. He had

spent nearly his entire life with his foster parents and bonded with them as well as their extended families. By contrast, there is no evidence that respondent's mother could have provided a home to accommodate A.N.'s needs. First, none of respondent's other children live with his mother. Additionally, Miller testified that A.N. would not have a bedroom and would have to share a bed with respondent's mother. Respondent's mother's home also had safety hazards, including exposed electrical wires. There is simply no evidence that respondent's mother could have provided A.N. with a safe environment. Given this record, we cannot say the trial court's finding that it was in the best interests of A.N. to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 34                                    III. CONCLUSION

¶ 35        For the foregoing reasons, we affirm the judgment of the circuit court of LaSalle County.

¶ 36        Affirmed.