NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 200020-U

NO. 4-20-0020

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 26, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* V.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | McLean County |
| Petitioner-Appellee, | ) | No. 18JA80 |
| v. | ) | |
| Amanda S., | ) | Honorable |
| Respondent-Appellant). | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding the trial court did not err in terminating respondent's parental rights.

¶ 2    In August 2018, the State filed a petition for adjudication of neglect or abuse with respect to V.S., the minor child of respondent, Amanda S. In October 2018, the trial court adjudicated the minor neglected, made her a ward of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights in August 2019. Following a hearing on the State's motion in December 2019, respondent admitted she was an "unfit person" based on one of the counts alleged in the State's petition. The court subsequently held a best-interests hearing, where the court found it was in the minor's best interests to terminate respondent's parental rights.

¶ 3    On appeal, respondent argues the trial court erred in terminating her parental

rights; contending the trial court's best-interest determination was against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5             In August 2018, the State filed a petition for adjudication of neglect with respect to V.S.—a minor child born in July 2016—alleging V.S. was living in an environment injurious to her welfare while in the care of respondent due to respondent's unresolved issues of alcohol and/or substance abuse and unresolved issues of domestic violence and/or anger management which created a risk of harm to the minor. 705 ILCS 405/2-3(1)(b) (West 2018). The State's petition also alleged the minor was neglected by the putative father, who was never involved in these proceedings and is not relevant for the purposes of this appeal. The following day, during the emergency shelter-care hearing, respondent stipulated to probable cause and immediate and urgent necessity and the court placed temporary custody and guardianship with DCFS. The court's written order found there was probable cause based on the stipulation as well as the reports showing respondent's history of substance abuse and domestic violence, and respondent's recent positive tests for cocaine.

¶ 6                         A. Adjudicatory Proceedings.

¶ 7             In October 2018, the court held an adjudicatory hearing wherein respondent admitted paragraph 3A of the petition which alleged she had unresolved alcohol and/or substance abuse issues and "several positive screens for cocaine." The trial court found, "The minor is neglected or abused as defined in [the Juvenile Court Act] [(705 ILCS 405/2-3 (West 2018))] in that the minor is in an environment injurious to the welfare of the minor as defined by 705 ILCS 405/2-3(1)(b)." The trial court admonished respondent to cooperate with DCFS, comply with the terms of the agency's service plan, and correct any conditions which required the minor to be in

the agency's care. If not, respondent would risk termination of her parental rights.

¶ 8        At the dispositional hearing in December 2018, the trial court found respondent unfit and unable to care for, protect, train, educate, supervise, or discipline V.S., and placement with respondent was contrary to V.S.'s health, safety and best interest because "[respondent] will need to complete substance abuse and [domestic violence] treatment *** and need to demonstrate the ability to live a sober lifestyle." The court found it was in the best interests of the minor that she be made a ward of the court, maintained custody and guardianship with DCFS, and found a return home within 12 months would be appropriate.

¶ 9        In March 2019, the trial court entered a permanency order, which included the goal of return home within 12 months. The court found respondent had not made reasonable and substantial progress or reasonable efforts toward a return of the minor and remained unfit due to her "continued use of marijuana and minimizing her continuing usage." Furthermore, the court found respondent's counselor "does not feel [respondent] is fully engaged in her individual counseling."

¶ 10        B. Termination of Respondent's Parental Rights

¶ 11        In August 2019, the State filed a motion seeking a finding of unfitness and termination of parental rights of respondent. The State alleged respondent was unfit pursuant to Illinois's Adoption Act (see 750 ILCS 50/1(D)(k), (m)(i), (ii) (West 2018)). Specifically, the State alleged respondent (1) suffered from habitual drunkenness or addiction to unprescribed drugs for at least one year prior to commencement of the unfitness proceedings, (2) failed to make reasonable efforts to correct the conditions which were the basis for removal of the minor during the nine-month period from November 1, 2018, through August 1, 2019, and (3) failed to make reasonable progress toward the return of the child during the same nine-month period. The

State's petition also alleged terminating respondent's parental rights served the best interests of the minor, V.S., and requested DCFS retain custody and guardianship over V.S. with the authority to consent to V.S.'s adoption.

¶ 12        At the previous permanency hearing in March 2019, the court heard respondent tested positive for drugs four times during a four-month period. At the August 2019 permanency review held before respondent was admonished on the termination petition, the court heard respondent failed to provide 22 out of 24 drug screens, cancelled eight sessions with her counselor, and failed to show up for three more. Although she attended six anger management counseling appointments, she was very inconsistent and missed several appointments. The status hearing report filed by the Center for Youth and Family Services (CYFS) in October 2019 indicated respondent completed only 7 out of 23 drug screens since the last reporting period. Out of the seven times she appeared, she tested positive for marijuana three times, and one of those screens tested positive for marijuana and cocaine. She also missed a total of four counseling sessions.

¶ 13        In December 2019, the trial court held a fitness hearing. By this time, respondent was incarcerated but was present for the hearing with counsel. Respondent admitted to the first allegation set forth in the State's termination petition, admitting she was an unfit person by habitual drunkenness or addiction to unprescribed drugs. In exchange for respondent's admission of unfitness to Count 1, the State dismissed the remaining counts. The State then presented a factual basis consisting of the proffer of two witnesses. The first, Brittany Barth, was a former CYFS caseworker. If called, she would testify that during the integrated assessment interview, respondent acknowledged she used cannabis daily since the age of 15 and shortly thereafter began using "spice," cocaine, and unauthorized prescription drugs. At the time DCFS became

involved with V.S., respondent was "binging every few days on alcohol and/or drugs." Carrie Marsh, a counselor with Chestnut, would testify respondent began substance abuse treatment at Chestnut on July 3, 2018; engaged in level two intensive outpatient treatment. After screening positive for cannabis, cocaine, and benzodiazepines during her treatment, she was recommended for level three residential treatment which she attended between August 31 and September 20, 2018. Respondent successfully completed residential treatment but continued to use drugs and failed to appear for required drug screenings upon her release. She was referred to residential treatment a second time, where again, upon completion of residential treatment and the commencement of outpatient treatment, she continued to use illegal substances and failed to attend mandatory treatment sessions until she was unsuccessfully discharged from treatment in October 2019. According to Marsh, respondent's prognosis was poor at the time of discharge and her diagnosis included cannabis, cocaine, and alcohol use disorders. Respondent stipulated to this testimony and the court found the State provided a sufficient factual basis by clear and convincing evidence. Based on the evidence and respondent's knowing and voluntary admission, the court found respondent unfit. The court then proceeded to a best-interests hearing.

¶ 14                                    C. Best-Interests Hearing

¶ 15            The State called caseworker Kaitlynn Stigall. She testified she is V.S.'s current caseworker. V.S.'s current placement with her aunt, Sarah Kiper, had been going very well. Stigall stated V.S.'s expected long-term placement was with V.S.'s aunt and uncle who live in Arizona. She said this placement had been approved and the agency was working towards the transition to the new home. Because the respondent was currently in custody, the agency wanted to wait until respondent was released from custody before the transition. This would take place in approximately 90 days and allow respondent an opportunity to spend time with V.S. before the

transition takes place. Stigall confirmed the prospective foster parents have a relationship with V.S., and upon learning they were going to be the prospective long-term foster home, they have been in contact with V.S. daily. She acknowledged respondent has a bond with V.S. and their visits together go well, but they have not had an in-person visit since respondent has been in custody. Citing respondent's substance abuse and mental health issues and her inability to help keep V.S. safe, Stigall recommended respondent's parental rights be terminated. When asked to elaborate, she said "I think her drug use is my biggest thing. She tends to pick using over [V.S.], and if you're under the influence *** you can't keep yourself safe, let alone someone that is as young as [V.S.]"

¶ 16        Next, the State called Sarah Kiper, the respondent's sister. Kiper testified V.S. currently lives with her but she was only willing to provide long-term placement if necessary. When questioned further, she stated, "I believe [V.S.] mentally and emotionally will be healthier if she's not locally near [respondent] and is not witness to some of the chaos that might follow her." When asked to elaborate, she stated, "Um [*sic*], [respondent] is not very stable. She does have substance abuse problems. She's not entirely independent and sometimes her mental health combined with her substance abuse problems can cause violent outbursts or lapses in judgment. And sometimes she takes that out on family." She agreed respondent's parental rights should be terminated and believed it would take "several years" before she thought it would be safe for respondent to be unsupervised around V.S. She also confirmed the potential foster parents in Arizona have a strong bond with V.S. and there are several other family members in Arizona who also have a relationship with V.S.

¶ 17        The State next called Tabitha Staley, who is V.S.'s aunt and prospective adoptive parent who lives in Arizona. Staley testified she and her husband have a place for V.S. to stay,

V.S. is familiar with their children, and the family lives close to the school V.S. will attend. Staley explained that Sarah Kiper, V.S.'s current placement, will also come to their home at the beginning of the placement to ensure the transition goes smoothly. When asked if she believes respondent's parental rights should be terminated, she stated, " I love [respondent], I always will, I always have. But with her substance abuse, the violent outbursts, the inability to care for her daughter, and [V.S.'s father] has never really spent quality time with his child or knows his child; I feel at this time it's best that they are removed from parental rights." She concluded that she and her husband would still adopt V.S. even without funding from DCFS. Before resting, the State asked the court to take judicial notice of the court file, which was allowed without objection.

¶ 18      Respondent testified she is currently incarcerated in the McLean County jail serving a 90-day jail sentence. She described her visits with V.S. as "amazing" and felt like she provided for V.S.'s needs during visitation. When asked who V.S. would want to live with, she responded, "Honestly, I don't know. I would like to say me, but I think she's safest right now with my family." When asked how long she felt she would need to be stable enough to take care of V.S. after being released from custody, she believed it would be about six months or less. When asked to explain, she stated she was "hoping" her prior employer would provide her with employment upon her release from jail and was "hoping" this employer would also provide her with lodging while she worked there. On cross-examination, she confirmed the only time she lived independently was for a brief period of time before V.S. was born, and the longest time she has ever been sober was for 90 days while she was in a residential treatment program. Finally, respondent admitted her current incarceration was due to a battery against her mother, and a jail sentence was imposed only after she failed to complete substance abuse and mental health

counseling pursuant to the agreement.

¶ 19        The trial court observed the respondent started off doing pretty well and was "participating in services," but noted 90 days was the longest she ever maintained sobriety and that was only when she was in a controlled environment. The court further noted this case was approximately 16 months old, and throughout the life of the case, respondent had not been able to tackle substance abuse issues or provide any type of permanent stability for V.S. The trial court expressly considered the various statutory factors contained in section 1-3(4.05) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-3(4.05) (West 2018)), as it made its best-interests determination. When the trial court looked at the safety and security of V.S., including her health, safety, and welfare, the court found this factor favored terminating respondent's parental rights. Respondent had a "difficult time taking care of herself independently," and "she's not able to meet *** [V.S.'s] needs on a full-time basis." Additionally, V.S. was familiar and felt secure with her current placement where she has spent almost half her life, and there was a long-term plan in place to have V.S. live with relatives she knows. Noting this long-term stable placement would be disrupted if V.S. were placed with respondent upon her release from incarceration, the court concluded "we need permanence, and the plan that is in place by CYFS seems to be an appropriate plan that provides for the permanence of [V.S.]." The court found the State proved by a preponderance of the evidence it was in V.S.'s best interest that respondent's parental rights be terminated.

¶ 20        This appeal followed.

¶ 21                                II. ANALYSIS

¶ 22        Respondent argues the trial court erroneously terminated her parental rights because the court's best-interest determination goes against the manifest weight of the evidence.

We disagree and affirm the trial court's judgment.

¶ 23　　　　The Juvenile Court Act (705 ILCS 405/1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person" and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998)). Here, respondent does not challenge the trial court's unfitness finding. Instead she challenges the trial court's determination it was in V.S.'s best interests to terminate her parental rights.

¶ 24　　　　Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of
> the child's identity; (3) the child's familial, cultural[,] and religious
> background and ties; (4) the child's sense of attachments, including

love, security, familiarity, continuity of affection, and the least

disruptive placement alternative; (5) the child's wishes and long-

term goals; (6) the child's community ties; (7) the child's need for

permanence, including the need for stability and continuity of

relationships with parent figures and siblings; (8) the uniqueness of

every family and child; (9) the risks related to substitute care; and

(10) the preferences of the person available to care for the child."

*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123,

141 (2006). See also 705 ILCS 405/1-3(4.05) (West 2018).

¶ 25 A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 26 Respondent contends the trial court's determination terminating her parental rights goes against the manifest weight of the evidence because it "is clearly against V.S.'s need for stability, affection, and her sense of attachment[] to [respondent] ***." The only evidence to which respondent points in support of this argument is that she had supervised visitation with V.S. without any issues. The State, on the other hand, presented substantial evidence in support of termination. V.S., who has been in foster care for almost half of her life, has a bond with her current placement, Sara Kiper, as well as a familiarity with the proposed alternative placement out-of-state. Both Kiper and the caseworker recognized V.S.'s interests would best be served by

placing her with other family members in a location further away from respondent. V.S. already has a relationship with her prospective foster parents—her aunt and uncle in Arizona—and there is extended family living nearby her prospective placement as well. The prospective parents have no health issues, have a steady income, have acclimated V.S. to their family, live close to a school V.S. will attend, and were very open to future contact between V.S. and respondent as long as it was in V.S.'s best interests. V.S.'s prospective placement will be with family members who are committed to caring for her well-being and safety. They are ready to accept V.S. into their home as a permanent placement and will do so, regardless of whether a DCFS subsidy followed. The court noted this serves her best interests because it provides the much-needed stability she requires.

¶ 27 Conversely, the State's witnesses unanimously agreed it was in V.S.'s best interests that respondent's parental rights be terminated. V.S.'s caseworker said respondent's struggle with substance abuse and mental health issues prohibited her from keeping V.S. safe. Respondent's sister, Sarah Kiper, echoed similar concerns, saying it would be "[s]everal years" before it would be safe for V.S. to be in respondent's care. She pointed out how respondent's substance abuse and mental health issues can lead to "violent outbursts or lapses in judgment" which she sometimes takes out on family members. She even recommended placing V.S. with family in Arizona in order to remove her from the "chaos that might follow [respondent]." Finally, V.S.'s prospective foster mother, Tabitha Staley, stated respondent's substance abuse issues and her violent outbursts leave her incapable of adequately caring for her daughter.

¶ 28 Respondent confirmed this testimony. She stated the longest time she has ever been sober was 90 days while she was in a residential treatment facility. She appeared at the termination proceeding currently serving a jail sentence for misdemeanor battery to her mother

only because she failed to complete substance abuse and mental health treatment. Respondent testified it would take her approximately six months to get stable and establish a safe home for V.S., although she had no concrete plans for exactly how that would occur. She admitted living independently only once before and that was before V.S. was born. She also "hoped" her old boss at a hotel would provide her with her former job but could not confirm any type of employment since she was in jail. She had no long-term plans for independent housing. She also hoped her former employer would allow her to stay in a hotel room while she worked there. Respondent candidly admitted V.S. would not be safe with her. When asked who V.S. wanted to live with, she stated, "Honestly, I don't know. I would like to say me, but I think she's safest right now with family."

¶ 29      The court found three statutory factors weighed most heavily in its best-interest determination. First, with regard to the child's physical safety and welfare, respondent is not able to care for herself independently and is unable to meet V.S.'s needs "on a full-time basis." Second, the court found V.S.'s security and familiarity support terminating respondent's parental rights because V.S. is familiar with her prospective foster parents and "forty percent of her life has been in the current placement." Third, V.S.'s need for permanence and stability favor termination as the proposed placement is the least disruptive and has an "appropriate plan that provides for the permanence of [V.S.]" with a family who truly cares for her. From our review of the record, we conclude the trial court had ample evidence before it to find it was in V.S.'s best interests to terminate respondent's parental rights. This case had been pending for almost 16 months and the child was only two years of age when placed into DCFS care, in part because of respondent's substance abuse issues. Respondent continued to test positive for drugs both before and after residential treatment and throughout the pendency of the case, to the point where she

- 12 -

was incarcerated by the time of the termination hearing for failing to successfully complete treatment. She failed to successfully complete anger management counseling and was sporadic in her participation. Throughout the life of the case she only occasionally cooperated with required drug screens, frequently tested positive, and often failed to appear. Respondent had progressed no further toward correcting the conditions which required V.S. to be placed in care after 16 months, than when she began. The possibility of returning the child to a parent who had so clearly indicated her lack of concern for her own welfare or that of her child would have been a greater disservice to the child. We cannot say the trial court's best-interests determination was against the manifest weight of the evidence.

¶ 30                                III. CONCLUSION

¶ 31          For the reasons stated, we affirm the trial court's judgment.

¶ 32          Affirmed.