NOTICE

Decision filed 07/31/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 200106-U

NOS. 5-20-0106, 5-20-0107

(consolidated)

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* K.A. and M.A., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 18-JA-68, 18-JA-188 |
| | ) | |
| Valerie A., | ) | Honorable |
| | ) | Martin J. Mengarelli, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's findings that the minors' mother was unfit, and that termination of her parental rights was in the best interests of the minor children, were not contrary to the manifest weight of the evidence.

¶ 2    Following an evidentiary hearing, the trial court found that respondent, Valerie A. (Mother), was unfit to parent her minor children, K.A. and M.A. In a subsequent hearing, the court found that the termination of Mother's parental rights was in the best interests of the minor children. On appeal, Mother alleges that the trial court's findings of unfitness

1

and its best interests' determinations were against the manifest weight of the evidence. For reasons that follow, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4     M.A. was born July 7, 2018. She is the biological child of Mother and Patrick Warhoover. Warhoover died on August 22, 2019, months before the filing of the petition to terminate parental rights in M.A.'s case. K.A. was born August 22, 2014. K.A. is the biological child of Mother and Scott Hartkopf. Hartkopf is also identified as M.A.'s legal father. Hartkopf was a party to the proceedings in the circuit court. The trial court found that Hartkopf was unfit to parent K.A. and M.A., and that the termination of his parental rights was in the best interests of the minor children. Hartkopf did not appeal the trial court's judgment, and he is not a party to this appeal.

¶ 5     On January 9, 2018, Mother overdosed on heroin in her home. At that time, Mother had three minor children, aged five, three, and one. K.A. and his older sibling saw Mother unresponsive on the bathroom floor. They watched as paramedics worked to revive her. Once Mother was responsive, she informed the paramedics that she was 12 weeks pregnant. The Illinois Department of Children and Family Services (DCFS) was notified, and that agency created a safety plan. Under the plan, K.A. and his siblings remained in the family home under the care of a paternal grandmother. All other adults who had been living in the home, including Mother and Hartkopf, were required to move out of the home. On February 13, 2018, Mother tested positive for amphetamines and methamphetamine. K.A. and his two siblings were immediately taken into protective custody.

2

¶ 6    On February 14, 2018, the Madison County State's Attorney (State) filed a juvenile petition in the circuit court of Madison County in the interest of K.A., a neglected minor (18-JA-68).[1] The State alleged that K.A. was neglected, as defined in section 2-3(1)(a), (b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), (b) (West 2018)), in that K.A.'s environment was injurious to his welfare and K.A.'s parents did not provide him with proper or necessary care, support, and education. As to Mother, the State specifically alleged that (a) Mother had a substance abuse issue which impaired her ability to adequately care for K.A. and his siblings; (b) Mother overdosed while in a caregiver role in the presence of K.A., and required Narcan to be revived; (c) Mother recently tested positive for amphetamines and methamphetamine; (d) Mother and legal father engaged in domestic violence; (e) Mother had been indicated by DCFS because of prior acts of inadequate supervision; and (f) Mother had pending criminal charges for theft. The State asserted that it was in the best interests of K.A. and the public that K.A. be adjudicated a neglected minor and made a ward of the court.

¶ 7    A shelter care hearing was held on February 14, 2018. The trial court found there was probable cause to believe K.A. was neglected, as alleged in the State's petition, and as defined in the Juvenile Court Act. The court entered a temporary order, removing K.A. from the custody of his parents and placing him in the custody of DCFS. The court also ordered weekly supervised visits between K.A. and Mother. Mother was admonished to

___

[1]The State also filed juvenile petitions on behalf of K.A.'s siblings in separate cases in the circuit court of Madison County. Those cases are not before us.

cooperate with DCFS, comply with the terms of the service plan, and correct the conditions that required K.A. to be placed in care.

¶ 8 DCFS created an initial service plan for Mother on March 12, 2018. Under the initial plan, Mother was required to cooperate with Caritas Family Solutions (Caritas) and complete an integrated assessment to identify services necessary for reunification. The permanency goal was to return K.A. home within 12 months.

¶ 9 On May 8, 2018, Caritas filed a case summary with the court. According to the case summary, Mother had not completed the initial integrated assessment, and she had not been cooperative with her Caritas caseworker. In addition, Mother had been referred to an inpatient substance abuse program in Chicago, but she left the program, against staff advice, after two weeks. The caseworker reported that Mother missed some scheduled visitation, was often late, and during visits did not appear to bond with K.A. and the other children. The summary also indicated that Mother was seven months pregnant, and not attending prenatal visits regularly. An updated service plan was included in the case summary. In addition to the prior tasks, Mother was required to obtain and maintain sobriety, participate in individual counseling and domestic violence counseling, complete a parenting class, and obtain prenatal care.

¶ 10 On June 26, 2018, the court held an adjudicatory hearing. Mother failed to appear, but Mother's lawyer was present. The court proceeded with the hearing and found that K.A. was a neglected minor. In the dispositional order, K.A. was made a ward of the court and placed in the custody and under the guardianship of DCFS. Supervised visitation was ordered, and an initial permanency hearing was set for September 27, 2018.

¶ 11    On July 7, 2018, Mother gave birth to M.A. Urine samples taken from Mother and M.A. tested negative for illegal substances, but M.A.'s meconium tested positive for methamphetamine. During a doctor's visit shortly before the delivery, Mother had tested positive for amphetamines and opiates. On July 11, 2018, M.A. was discharged from the hospital, taken into protective custody, and placed with a relative. Shortly after the initial placement, the relative expressed an inability to care for a newborn. M.A. was then placed in a traditional foster home. According to reports from the foster parents, M.A. experienced withdrawal symptoms, including tremors, sensitivity to light, and increased agitation.

¶ 12    On July 12, 2018, the State filed a juvenile petition in the interest of M.A., a minor (18-JA-188). The State made the same allegations that it asserted in K.A.'s case. The State further alleged that Mother had reported to her caseworker that she used heroin 10 days before giving birth to M.A., and that Mother tested positive for amphetamines and opiates on June 8, 2018, and June 30, 2018. Following a shelter care hearing on June 12, 2018, the court entered an order, placing M.A. in the temporary custody of DCFS.

¶ 13    Mother's service plan was updated on July 19, 2018, after M.A.'s birth. Under the plan, Mother was required to cooperate with Caritas Family Solutions, complete an integrated assessment, obtain and maintain sobriety, cooperate with periodic random drug testing, participate in individual counseling and domestic violence counseling, and complete parenting classes. On October 25, 2018, the court entered an order, finding that M.A. was neglected by Mother and the legal father (Hartkopf). M.A. was made a ward of the court and placed in the custody of DCFS. In a subsequent order, entered on February 19, 2019, the court found that M.A. was neglected by her biological father (Warhoover).

5

¶ 14    Meanwhile, on September 27, 2018, an initial permanency hearing was held in K.A.'s case. After considering the record, including the caseworker's report to the court, the statutory factors, and the permanency goals, the court determined that Mother had not made reasonable and substantial effort and progress toward returning K.A. home. The custody of K.A. was continued with DCFS, and the permanency goal, returning K.A. to the home within one year, remained in place.

¶ 15    On April 9, 2019, a subsequent permanency order was entered in K.A.'s case, with the same permanency goal. At that time, Mother had not satisfactorily completed any of the tasks in her service plan, except the integrated assessment interview. On that same date, the court entered an initial permanency order in M.A.'s case, with the permanency goal to return M.A. to the home within one year.

¶ 16    On August 27, 2019, and again on October 1, 2019, updated permanency orders were issued in each of the minors' cases, with the continued goals of returning K.A. and M.A. to the home within one year. On each occasion, the permanency orders indicated that Mother had not satisfactorily completed the tasks in her service plan, and that Mother had not made reasonable and substantial efforts and progress toward the return of the minor children.

¶ 17    On January 7, 2020, the State filed a petition for the termination of parental rights and for the appointment of a guardian with power to consent to adoption in the minors' cases. In each petition, the State asserted the following four grounds on which to find Mother unfit under section 1(D) of the Illinois Adoption Act (750 ILCS 50/1(D) (West 2018)): (1) Mother has an addiction to drugs "in that she has shown an inability and/or an

6

unwillingness to refrain from the use of drugs, her frequent indulgence has instilled in her a habitual craving, and this is manifested in an ongoing pattern of drug use"; (2) Mother failed to make reasonable efforts to correct conditions that were the basis for the removal of the minors during any nine-month period following the adjudication of neglect (specifically June 26, 2018, through the date of filing the petition as to K.A., and October 25, 2018, through the date of filing the petition as to M.A.); (3) Mother failed to make reasonable progress toward the return of the minors during any nine-month period following the adjudication of neglect (specifically June 26, 2018, through the date of filing the petition as to K.A., and October 25, 2018, through the date of filing the petition as to M.A.); and (4) Mother has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the minors.

¶ 18    On February 25, 2020, the trial court held an unfitness hearing. The court heard testimony from Margaret Bruhn, a caseworker employed by Caritas. Bruhn was assigned to the case in October 2018. Prior to Bruhn's assignment, another Caritas caseworker had assisted the family following the initial referral in February 2018 through the middle of October 2018.

¶ 19    Bruhn testified that she reviewed the entire case file. She recounted the circumstances that brought K.A. and M.A. into care. Bruhn noted that in January 2018, Mother had overdosed in the presence of K.A. and his siblings, and that Mother was pregnant with M.A. at the time of the overdose. Bruhn testified that K.A. was placed in the custody of DCFS on February 13, 2018, after Mother tested positive for amphetamines and methamphetamine. Bruhn stated that Mother gave birth to M.A. on July 7, 2018, that M.A.

7

was a substance-exposed newborn, and that M.A. came into care immediately upon being discharged from the hospital on July 11, 2018.

¶ 20 Bruhn testified that an initial service plan was created for Mother on March 12, 2018, and that the plan was reviewed every six months. Bruhn explained that Mother was required to cooperate with the agency, complete an initial assessment, complete parenting classes, obtain and maintain sobriety, and participate in individual counseling and domestic violence counseling.

¶ 21 Bruhn noted that Mother eventually completed the initial integrated assessment in August 2018, one month after M.A. was born. Bruhn testified that Mother had been referred for services, including substance abuse treatment, individual and domestic violence counseling, and parenting classes. Bruhn described Mother's efforts and progress in her testimony and her report. Mother successfully completed a parenting class in July 2019. Mother was referred for individual counseling but did not attend. Mother completed a domestic violence assessment and received a recommendation to participate in 26 group sessions. Mother attended some group sessions. When, however, Mother appeared for a session under the influence, and caused a disruption, she was asked to complete substance abuse treatment before returning. Mother did not return to the program and was unsuccessfully discharged.

¶ 22 According to Bruhn's testimony and report, Mother did not complete substance abuse treatment and she continued to actively use drugs. In March 2018, Mother was referred to a substance abuse treatment program in Chicago. Mother left after two weeks, against staff advice. In April 2018, Mother obtained an assessment for an outpatient

8

substance abuse treatment program, and she attended some group sessions in May 2018. Mother was unsuccessfully discharged from the program in July 2018. Mother received a subsequent substance abuse treatment referral, but she did not follow up, and was again unsuccessfully discharged from the program in December 2018. Bruhn testified that Mother agreed to take random drug tests. Bruhn stated that since the beginning of the case, Mother appeared for 4 tests and failed to appear for 13 tests. The results of the completed tests showed that Mother tested positive for methamphetamine and amphetamines on March 1, 2018, August 9, 2018, and October 21, 2019, and that she tested negative on March 18, 2018. Bruhn testified that in December 2019, Mother gave birth to a baby in a bathtub at her home. Mother and the newborn baby tested positive for fentanyl. Bruhn noted that Mother did not have prenatal care and used drugs during the pregnancy. Bruhn testified that Mother did not complete substance abuse treatment and did not attain sobriety.

¶ 23   Bruhn described Mother's level of cooperation with the agency as unsatisfactory in that Mother was difficult to reach and did not return calls. Bruhn described Mother's visits with the children as chaotic. Bruhn opined that Mother was unfit because she failed to make substantial progress toward correcting the conditions that brought the children into care.

¶ 24   During cross-examination, Mother's attorney asked whether Bruhn had received documentation that Mother attended TASC for any substance abuse treatment. Bruhn testified that the first time Mother mentioned TASC was just prior to the unfitness hearing that morning, and that Mother had not provided documentation of any treatment. Bruhn further testified that, to her understanding, TASC did not offer a treatment program. Bruhn acknowledged that Mother brought Christmas gifts and birthday gifts for M.A. and K.A.

9

She also acknowledged that Mother attempted to call the children. Bruhn stated that some of Mother's calls were refused because Mother was not respecting the boundaries of the foster parents.

¶ 25   After considering the testimony, the report, and the evidence, the trial court found that the State had proven the allegations of Mother's unfitness by clear and convincing evidence. The court found that Mother had an addiction to drugs "in that she has shown an inability and/or an unwillingness to refrain from the use of drugs, her frequent indulgence has instilled in her a habitual craving, and this is manifested in an ongoing pattern of drug use"; that Mother failed to make reasonable efforts to correct conditions that were the basis for the removal of the minors during any nine-month period following the adjudication of neglect; and, that Mother failed to make reasonable progress toward the return of the minors during any nine-month period following the adjudication of neglect. The court determined that Mother was unfit within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)).

¶ 26   A best interest hearing was held immediately after the unfitness hearing. The court heard additional testimony from Margaret Bruhn. Bruhn stated that M.A. had been placed in a foster home on July 19, 2018, and that K.A. joined her in that home on January 14, 2019. Bruhn testified that she made visits to the foster home and observed that the children were safe, comfortable, and well-cared for, and they had bonded with the foster moms. Bruhn testified that both foster parents were employed, and they were able to meet the needs of the children. She noted that the children call their foster parents "mom." She also noted that the foster parents were open to visits with the children's siblings, and potentially

10

with Mother, if she completed treatment and counseling. Bruhn testified that the foster parents signed permanency commitments and were willing to adopt the children. Bruhn testified that termination of parental rights would be in the best interests of the minors. The children's guardian *ad litem* also testified that based on the evidence and the statutory factors, it would be in the best interests of the children to terminate parental rights and free the children for adoption.

¶ 27    After considering the testimony, the recommendation of the guardian *ad litem*, and the factors set out in section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3 (West 2018)), the trial court found that it was in the best interests of K.A. and M.A. that parental rights be terminated. The court stated that it considered all relevant factors, and specifically observed that the physical needs of the children were being met by the foster parents, that the children had formed an attachment to the foster parents and the home, and that the children had developed a sense of stability and continuity with the parental figures

¶ 28                                   II. ANALYSIS

¶ 29    On appeal, Mother claims that the trial court erred in terminating her parental rights. She contends that the court's determinations, that she was unfit, and that the termination of her parental rights was in the best interests of the minor children, were against the manifest weight of the evidence.[2]

---

[2]Mother filed a notice of appeal from the order terminating her parental rights in K.A.'s case (5-20-0106) and a separate notice of appeal from the order terminating her parental rights in M.A.'s case (5-20-0107). Pursuant to Mother's motion, we ordered the appeals consolidated under 5-20-0106 for purposes of briefing and decision.

11

¶ 30　In Illinois, the authority to terminate parental rights is found in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2018)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2018)). *In re J.L.*, 236 Ill. 2d at 337. Section 2-29 of the Act establishes a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018). First, the State must prove, by clear and convincing evidence, that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2), (4) (West 2018); *In re J.L.*, 236 Ill. 2d at 337. If the trial court finds the parent unfit, the matter proceeds to a second hearing, where the State must prove, by a preponderance of the evidence, that it is in the child's "best interests" that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2018); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). During the second step of the process, the focus of the court's scrutiny shifts from the rights of the parents to the best interests of the child. *In re D.T.*, 212 Ill. 2d at 365. Section 1-3 of the Juvenile Court Act lists the "best interests" factors that should be considered by the trial court when making a "best interests" determination. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 31　　　　　　　　A. Determination of Unfitness

¶ 32　On appeal, Mother argues that the trial court's finding of unfitness was manifestly erroneous because the State failed to prove her unfitness under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2018)) by clear and convincing evidence. More specifically, Mother claims that the trial court failed to consider the reasonable efforts and

progress she made to correct the conditions that led to the removal of her children. Mother points out that she successfully completed a parenting class, that she obtained multiple substance abuse assessments, and that she obtained an assessment for domestic violence services and attended some sessions. Mother also claims that she attended substance abuse treatment through TASC, and that she was not asked to take any drug tests after December 2019. Mother further notes that she visited with her children and brought them Christmas gifts and birthday gifts.

¶ 33    A trial court's finding of parental unfitness involves findings of fact and credibility assessments which are accorded great deference by a court of review. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 22. The trial court's finding of parental unfitness will not be disturbed on review unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A finding of parental unfitness is against the manifest weight of the evidence only where the opposite conclusion is apparent. *In re Gwynne P.*, 215 Ill. 2d at 354. Every matter concerning parental fitness is *sui generis*, and so each case must be decided on the facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d at 354.

¶ 34    In this case, the trial court determined that the State met its burden to prove Mother's unfitness by clear and convincing evidence. The court found that Mother failed to make reasonable efforts to correct conditions that were the basis for removal of the minors during any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2016)), and that she failed to make reasonable progress toward return of the minors in any nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2016)).

¶ 35 A trial court's finding of unfitness will stand if it is supported by any one of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Gwynne P.*, 346 Ill. App. 3d 584, 590 (2004), *aff'd*, 215 Ill. 2d 340 (2005). "Reasonable effort" is judged by a subjective standard that refers to the amount of effort which is reasonable for a particular parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). The court must determine whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 24.

¶ 36 In this case, the conditions that were the basis for removal of K.A. and M.A. were that Mother failed to provide the minors with necessary care and support because she had a substance addiction. The record reveals that Mother was either unwilling or unable to complete substance abuse treatment and counseling, even after M.A. was born with a methamphetamine exposure. Based on the testimony and progress reports of Mother's caseworkers, Mother was not compliant with drug screenings, appearing 4 out of 17 times. Mother failed to participate in individual counseling, and she failed to complete domestic violence counseling, having been unsuccessfully discharged after attending a session while under the influence. There is no evidence that Mother was ever able to attain and maintain sobriety, despite being provided with services. The testimony and progress reports of the caseworkers also demonstrates that Mother's attendance for visitation was inconsistent, and that Mother's cooperation with the agency was unsatisfactory. There was overwhelming evidence that Mother had a substance addiction which impaired her ability to adequately care for, or parent, the minor children, and that Mother was unable or

14

unwilling to take advantage of the substance abuse treatment and counseling services offered to her. The trial court certainly recognized that Mother obtained three different substance abuse assessments, as well as other assessments. The court also recognized that Mother failed to make a commitment to the treatment programs recommended following these assessments. Based on the evidence in the record, the trial court's determination that Mother was unfit for failing to make reasonable efforts toward correcting the conditions that led to the removal of the minors during any nine-month period following the adjudications of neglect was not against the manifest weight of the evidence.

¶ 37    In addition, the trial court's finding that Mother failed to make reasonable progress toward the return of K.A. and M.A. in any nine-month period following their respective adjudications of neglect was not manifestly erroneous. "Reasonable progress" is judged by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. "Reasonable progress" requires a measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. A parent has made reasonable progress when the trial court can conclude that it will be able to return the child to parental custody in the near future. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. If a service plan has been established to correct the conditions that were the basis for removal of the child from the parent, a failure to make reasonable progress includes a failure to substantially fulfill her obligations under the service plan. 750 ILCS 50/1(D)(m) (West 2018).

15

¶ 38    Mother's first service plan was created in March 2018, shortly after K.A. went into the care of DCFS. Mother's service plan was updated after M.A.'s birth, and thereafter reviewed several times over the course of this case. Under the service plan, Mother was asked to cooperate with the agency, complete an integrated assessment, complete a parenting course, participate in individual counseling and domestic violence counseling, and obtain and maintain sobriety. Based on the testimony and progress reports of the caseworkers, Mother completed only the initial assessment and a parenting course. Despite taking the parenting course, the caseworkers reported that during visitation, Mother displayed poor parenting skills. Mother obtained assessments for domestic violence counseling and substance abuse treatment. But again, Mother never completed these programs. At the time of the termination proceedings, it had been two years since K.A. had been adjudicated neglected, and more than one year since M.A. had been adjudicated neglected. Despite the passage of time, Mother failed to make any measurable progress toward reunification. Based upon the evidence presented, the trial court's finding that Mother was unfit for failing to make reasonable progress toward return of the minors was not against the manifest weight of the evidence.

¶ 39                    B. Determination of Minors' Best Interests

¶ 40    Once a parent has been found unfit, the parent's rights yield to the child's best interests. *In re D.T.*, 212 Ill. 2d at 365. At the best interest stage of the proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the best interests of the child. *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009). A reviewing court will not reverse the trial court's determination as to the child's

16

best interests unless that determination is against the manifest weight of the evidence. *In re Jay H.*, 395 Ill. App. 3d at 1071.

¶ 41 The record reveals that Mother's lack of effort and progress toward reaching the objectives in her service plan, in particular, her inability to attain and maintain sobriety, adversely impacted her abilities to bond with K.A. and M.A., and to care for them. According to the testimony and progress reports, the needs of K.A. and M.A. were being met in foster care. The children were safe and fully integrated into the foster home, and they had bonded with the foster parents. The foster parents were eager to adopt the children. The foster parents permitted the children to maintain relationships with their other siblings. Under the circumstanced presented, the trial court's determination that the termination of Mother's parental rights was in the best interests of the children was not contrary to the manifest weight of the evidence.

¶ 42                    III. CONCLUSION

¶ 43 Accordingly, the judgment of the circuit court of Madison County is affirmed.


¶ 44 Affirmed.