NOTICE
Decision filed 07/25/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250146-U

NO. 5-25-0146

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* LEVI M.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Williamson County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-JA-15 |
| | ) | |
| Cody P., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Cates[*] and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where Cody P. appeared at early proceedings, was personally served, and was properly served by publication, the trial court had personal jurisdiction. Where the trial court correctly found that Cody P is an unfit parent for failing to maintain a reasonable degree of interest, concern, or responsibility, and found that the best interest of Levi M.P. would be served by termination of Cody P.'s parental rights, we affirm both orders.

¶ 2    Cody P. (Cody) appeals from the trial court's orders finding that he was an unfit parent of his son, Levi M.P. (Levi), and then terminating his parental rights. On appeal, he argues that the trial court lacked personal jurisdiction and that the court's two orders were erroneous. For the

---

[*]Originally Justice Welch was assigned to the panel. Justice Cates was later substituted on the panel and has read the briefs.

1

reasons stated in this order, we conclude that the trial court had personal jurisdiction and affirm both orders.

¶ 3                                                I. BACKGROUND

¶ 4     Levi is a male child born on February 29, 2024. On March 1, 2024, the Department of Children and Family Services (DCFS) filed both its original and an amended petition for adjudication of wardship. Levi's parents, Cody and Diane M. (Mother), were named as respondents to the petition. Levi was placed in DCFS protective custody. DCFS alleged that Levi was in an environment injurious to his safety and welfare because both parents had a history of substance abuse that interferes with their ability to parent. Specifically, DCFS stated that Levi was born substance-exposed; that Mother admitted to using methamphetamine before she gave birth; that on February 29, 2024, Mother tested positive for methamphetamine and amphetamines; and that Cody had a history of methamphetamine use. In addition, DCFS alleged that the parents have "indicated" DCFS reports involving Mother's three older children—that there was a substantial risk of physical injury to the three children and that the children were living in an injurious environment. The youngest of these three children, Olivia P. (Olivia), was in substitute care pending termination of parental rights. Both parents also had drug-related arrests and Cody had convictions for assault, larceny, and pending cases for burglary and damage to property. DCFS stated that no intact family services or a safety plan could be utilized because of the family's past DCFS history and ongoing drug usage. On this same date, the trial court entered its temporary custody order, noting that both parents had received notice and were present via Zoom. The court found that there was probable cause for filing the petition because of Mother's ongoing substance abuse issue, Levi being born substance-abused, and Cody and Mother having no housing. The court placed Levi in DCFS's temporary custody after finding that there was an immediate and

2

urgent need to remove him from the custody of his parents. The court ordered DNA testing to confirm that Cody was the biological father. The court appointed counsel to represent Cody.

¶ 5    On May 9, 2024, the trial court entered its adjudicatory order finding that Cody had "been served with summons." The order reflects that Cody and Mother were both present for the hearing. The court found that Levi had been abused or neglected in that (1) he received a lack of support, education, or remedial care (705 ILCS 405/2-3(1)(a) (West 2022)); (2) he was in an injurious environment (*id.* § 2-3(1)(b)); and (3) he was a drug-exposed infant (*id.* § 2-3(1)(c)).

¶ 6    On May 20, 2024, Court Appointed Special Advocates (CASA) filed its report with the court. CASA reported that two of Mother's children with a different biological father were removed from her care on October 21, 2022, and placed with their biological father. Olivia, an older child of Cody and Mother, was also born substance-abused and DCFS took her into protective custody on October 21, 2022. Levi was living in a traditional foster home in Benton and was doing well. Cody and Mother were having visits with Olivia—their older child—but the location kept changing because Mother was accused of theft from the Franklin County CASA visitation room, and then Cody was overheard voicing a threat during visitation at the Marion DCFS office. Visits were then moved to the Marion Police Department. At the first Marion Police Department visit, Mother was arrested for failing to appear at a court hearing in Saline County. Thereafter, the visits were suspended. CASA noted that it had no opportunity to watch Cody interact with Levi. Cody and Mother were living in his fifth wheel trailer on property owned by Cody's grandmother. They were evicted from the property and moved to a friend's home in Benton, with unspecified future plans about moving the fifth wheel to property in Hurst where they would live until a house on that Hurst property—currently without electricity—became habitable. Cody was unemployed but has carpentry and floor installation skills. DCFS mandated

that Cody complete mental health and substance abuse assessments and participate in all recommended services, and complete domestic violence services. He successfully completed parenting services. Cody was scheduled for a random drug test on April 12, 2024, but he failed to show up. Cody was charged with retail theft in Franklin County and had a plea hearing for that case on May 1, 2024. On May 2, 2024, Cody was arrested and jailed in Williamson County for possession of methamphetamines. CASA noted that a hearing to terminate parental rights to Olivia was scheduled for June 27, 2024.

¶ 7     On June 10, 2024, DCFS filed its dispositional report with the court. As of that date, DCFS noted that it did not have an address for Cody and Mother. DCFS reported that Levi and Olivia were now placed in the same foster home. Cody and Mother informed DCFS that if their parental rights to Olivia were terminated at the upcoming June 27, 2024, hearing, they would surrender their parental rights to Levi. Based upon the integrated assessment, DCFS recommended that Cody work on cooperation, engage in parenting education, complete mental health and substance abuse assessments and any recommended services, and engage in domestic violence services. DCFS noted that Cody struggled with cooperation and communication with DCFS. He completed parenting classes, did not believe that he and Mother needed domestic violence services, and had not made progress in mental health and substance abuse services. On June 6, 2024, Cody was charged with burglary in Williamson County. Visits with the children had been halted.

¶ 8     DCFS filed its family service plan with the court on June 12, 2024. Cody only received a satisfactory rating on parenting services, while Mother was rated unsatisfactory on all service areas.

¶ 9     On June 13, 2024, the trial court held the dispositional hearing. The record indicates that both Cody and Mother were not present at this hearing but had received notification of the hearing.

4

Both parents were represented by counsel. The court entered its order finding that Levi was neglected and that it was consistent with his health, welfare, safety, and in his best interest to be made a ward of the court. Both Cody and Mother were found to be unfit and unable to care for Levi. Visitation with Levi was at DCFS's discretion.

¶ 10 On June 14, 2024, the court-appointed guardian *ad litem* (GAL) for Levi filed a motion asking the court to terminate "reasonable efforts" to reunify Levi with Cody and Mother.

¶ 11 On June 26, 2024, the DNA report was filed with the court. The results established that Cody is Levi's biological father. On June 27, 2024, the court entered its order establishing Cody as Levi's father.

¶ 12 On June 27, 2024, Mother surrendered her parental rights to both Olivia and Levi. On the same date, the trial court entered its order terminating Mother's parental rights to Olivia and Levi and granted DCFS the power to consent to their adoptions.

¶ 13 On August 6, 2024, DCFS filed a status update on Cody's case. DCFS reported that Cody attended an out-of-state substance abuse rehabilitation program. He had several criminal cases pending. He was not involved in services, and DCFS did not know his address.

¶ 14 On August 8, 2024, the trial court entered its order granting the GAL's motion for early termination of reasonable efforts regarding Cody. On that same date, the court held a permanency hearing. The order stated that the appropriate permanency goal was substitute care pending termination of parental rights. The court found that Cody had not made reasonable and substantial progress, nor reasonable efforts towards returning Levi home. Custody and guardianship was maintained with DCFS.

¶ 15 On August 25, 2024, DCFS filed its next family service plan with the court. Cody was rated unsatisfactory on all service plan objectives except for parenting skills. While Cody had

5

begun counseling for substance abuse and mental health concerns, and reported that he was not using drugs, DCFS reported that his drug tests revealed his continued use of drugs. DCFS noted that it was impossible to determine appropriate services to treat Cody's substance abuse issues because he was not being truthful.

¶ 16    On October 17, 2024, the State filed its petition to terminate Cody's parental rights, alleging that he was unfit due to (1) abandonment of the child; (2) failure to maintain a reasonable degree of interest, concern, or responsibility as to Levi's welfare; and (3) desertion.

¶ 17    On October 29, 2024, CASA filed its report with the court. CASA reported that Cody's parental rights for Olivia were terminated by the court on August 8, 2024.

¶ 18    On November 8, 2024, DCFS filed its permanency report with the trial court. DCFS recounted Cody's lack of progress in his service plan objectives, his continued use of drugs, and his pending criminal charges in four counties. His caseworker last met with Cody at the Williamson County jail on July 26, 2024.

¶ 19    The record contains three summons to Cody intended to notify him of the hearing on the State's petition to terminate his parental rights. Each contained a different address in Williamson County, and all were returned unserved. On November 14, 2024, the State advised the court that they had not been able to obtain service on Cody. The court referenced the possibility of service by publication, but the State informed the court that in-person service remained possible either at one of his criminal court hearings or at the county jails. However, on November 20, 2024, the State filed its affidavit for service of Cody by publication. The affidavit listed four possible addresses for Cody and stated that DCFS had conducted a diligent search for Cody but had not been able to have him personally served.

¶ 20     On December 2, 2024, the Jackson County Sheriff's Office obtained personal service on Cody at the Jackson County courthouse. On December 11, 2024, the Illinois Press Association filed its certificate of publication with the court, establishing service of Cody by publication.

¶ 21     On December 19, 2024, the court held the next hearing. Cody was present. Cody confirmed to the trial court that he had received a copy of the petition for termination of his parental rights. Cody's attorney confirmed that his client was planning on contesting the petition to terminate his parental rights. The court set the termination hearing for January 30, 2025.

¶ 22     On January 30, 2025, the trial court held the termination hearing. The State called Brooke Copher (Copher) as a witness. Copher testified that she had been employed by DCFS for three years and was a child welfare specialist.

¶ 23     Copher testified that she had been assigned this case at Levi's birth. However, she testified that she had been working with this family since 2022 because she was the child welfare specialist for Olivia, Levi's older sister. Copher testified that the most recent service plan for Cody was dated September 25, 2024. Cody's attorney objected to Copher's proposed testimony about Cody's progress on that service plan because the State's grounds for termination—abandonment, failure to maintain a reasonable degree of interest, concern, or responsibility, and desertion—had no bearing on whether Cody made progress on his service plan objectives. The State countered that progress on the service plan objectives was connected to Cody's failure to maintain a reasonable degree of interest, concern, or responsibility for Levi. The trial court agreed with the State's position and allowed additional questioning about Cody's progress on his service plan objectives. Copher testified that Cody had only one visit with Levi, did not complete the integrated assessment, and did not participate in the administrative case review. Copher said that the first time she saw Cody in several months was at the December 2024 hearing, and that Cody did not

7

speak with her or inquire about Levi. Overall, Copher testified that it was difficult to be in contact with Cody because he was in and out of county jails. She testified that Cody did not maintain contact with her and did not maintain an address or telephone number. She testified that she: "continued to run diligent searches for [Cody] through multiple agencies, databases throughout the state and throughout the entire United States. Those diligent searches continue to report the same address and phone number that I had for [Cody] and no updated information."

¶ 24    Copher testified that Cody was not present for Levi's birth. Levi was immediately placed in protective custody. As of the date of the hearing, Levi was 11 months old.

¶ 25    On cross-examination, Copher acknowledged that Cody caused no delay in the DNA testing because his DNA was already on file. Cody learned that he was Levi's biological father in June 2024. Copher testified that DCFS had made a critical decision that discontinued Cody's visitation rights. Copher testified that she exited the courtroom after the December 2024 hearing to speak with Cody, but he had already left.

¶ 26    On redirect, the State asked Copher to provide additional information about the critical decision regarding Cody's visitation rights. Copher testified that Cody made a death threat involving a DCFS building. Thereafter, the visitation site was changed to the Marion Police Department to have security present if there were any issues. At Cody's one visit with Levi at the Marion Police Department, police came into the room and arrested Mother. Police then informed Copher that Levi may not be safe with Cody. After that, DCFS determined that visitation must stop until the agency could assess the safety concerns. Copher testified that she personally notified Cody of this decision.

¶ 27    On recross-examination, Cody's attorney asked Copher what steps DCFS took to assess the safety of the parents after visitation was suspended. Copher testified that they looked at Cody's

8

criminal record in which he committed several violent crimes. She clarified that Cody's threat was a documented threat to blow up the DCFS building. She stated: "[Cody] was unsafe to visit with his children for any reason whether that be elopement, harm, harm to myself because I was supervising those visits and the threat was made against the department." She testified that on his one visit at the Marion Police Department, Cody became irrational after Mother was arrested and removed. He followed the officers, and left Copher with Levi and Olivia in the visit room. The Marion Police Department then instructed Copher not to leave with the children until Cody was gone. She further testified that during this one visit Cody questioned whether Levi was his biological child and fought with Mother throughout the visit. Copher described the environment as "very chaotic." Cody's attorney questioned why visits were never resumed. Copher testified that Cody never contacted her or DCFS, and she had no ability to contact him as she lacked his address and/or a phone number.

¶ 28   Cody also testified at the hearing. He testified that he learned that he was Levi's father after the DNA results were returned. Cody confirmed that he only had one visit with Levi for one hour. After that, he made numerous phone calls to Copher about setting up additional visits. Cody testified that Copher told him he could only have visits at a police department and that DCFS did not have workers to handle the visits. He said that he made these phone calls through mid-April 2024, but with no response, he eventually stopped calling. Cody testified that he bought clothing for Levi before he was born, but none after he was born. At Christmas, he bought a couple of toys for Levi but had no way to deliver them to him.

¶ 29   The GAL for Levi cross-examined Cody about his criminal cases and housing. Cody confirmed that he pled guilty to theft in Jackson County on December 2, 2024. He was charged with methamphetamine possession in both Franklin County and Williamson County in 2024, and

9

he was charged with burglary in Williamson County. Cody also confirmed that his grandmother evicted him from her property in 2024.

¶ 30    The court took judicial notice of the previous orders in this case: adjudication, disposition, and permanency, as well as the order it entered for early termination of reasonable efforts. The court noted that Cody did not appear at the hearing on the request for entry of an early termination of reasonable efforts order. The court stated that reasonable efforts and progress on service plan objectives weighed on Cody's demonstration of a degree of interest, concern, and responsibility for Levi.

¶ 31    Cody's attorney argued that his client never received fair treatment in this case, noting that the motion for early termination of reasonable efforts occurred before the DNA test results had been released. He contended that the State was expecting Cody to complete service plan tasks before he was even confirmed as the father.

¶ 32    The court noted that there were two service plans in the court file. The first was filed on June 13, 2024, although that plan indicated that it was a 2022 service plan,[1] and the second was filed on September 25, 2024. On the grounds for unfitness alleged in the petition to terminate, the court found that (1) the State failed to prove abandonment because Levi was never in Cody's care and (2) the State failed to prove desertion considering DCFS's involvement in the case that prohibited Cody from "doing certain things in this case." However, the court concluded that the State proved Cody's unfitness for failure to maintain a reasonable degree of interest, concern, or responsibility as to Levi's welfare by clear and convincing evidence. In support, the court specifically found the following facts relevant to its decision: Cody was not present for Levi's

---

[1]This service plan relates to the DCFS case involving Levi's older sister, Olivia. Cody was determined to have been Olivia's father and was a part of that investigation and case.

birth; he did not participate in DCFS's integrated assessment; he did not participate in the administrative case review; he had little to no communication with DCFS; and he only minimally participated in mandated services. The court also noted the history of Cody's missed appearances in court, that he stopped efforts to contact DCFS in April 2024; that he had not contacted Copher since he was released from jail; that he did not talk to Copher at the December 2024 court hearing; that he failed to appear for at least one drug screen; and that he made no effort to reach out to DCFS about providing clothing, presents, and/or financial support for Levi.

¶ 33     The court held the best interest hearing immediately after the completion of the fitness hearing. The State called DCFS caseworker Copher, foster parent Christine Carroll, and foster parent Jim Carroll.

¶ 34     The State first called Copher who testified that Levi is in a traditional foster placement with his sister, Olivia. Upon his release from the hospital, he was placed in this home. Copher testified that Levi was doing very well in that setting and was happy and bonded with his foster family. The foster family was committed to permanency.

¶ 35     The State next called Christine Carroll. Christine stated that she was Levi's foster parent. She testified that she had six biological children, with one still living in her home, and she had adopted three children, including Levi's sister, Olivia. She testified that when Mother went into labor with Levi, she called Christine who came to the hospital the next morning. Christine stayed with Levi during his withdrawal from drugs, and then she took him to her home upon his release from the hospital. She stated that all the children get along well. She testified that although it is sad that a child must have his parental rights terminated, she believed termination was the right path for Levi.

¶ 36    The State finally called Jim Carroll to testify. Jim testified that he is Levi's foster dad. He stated that he was 100% committed to adopting Levi and that he didn't "really see a future any other way." He stated that he saw no issues or concerns about Levi staying with their family on a permanent basis. He indicated that he and Christine have only had four foster children, including Levi, and that he and Christine adopted the first three, the most recent adoptee being Levi's sister, Olivia.

¶ 37    Cody testified at the best interest hearing. He testified that he was not present at Levi's birth because the night before he "rolled my truck *** and I was laid up in the camper." He stated that he intended to be present for Levi's birth. Cody testified that he wanted to exercise his visitation rights. In pursuing those rights, he stated that he called Copher 10 times between the March 2024 visit and the end of April 2024.

¶ 38    At the conclusion of the best interest hearing, the trial court found that the State had established by the preponderance of the evidence that terminating Cody's parental rights was in Levi's best interest. In support, the court noted:

> "It is the only home that has provided physical safety, welfare, food, shelter, health, clothing to the minor child. That is where the child is developing his identity. It is where his biological sibling is located, and he has a relationship with that child. ***
>
> I don't think anyone disputes the fact that the child has a sense of belonging, is certainly loved in that environment, has a sense of security and familiarity in that home, as well as, having community ties with siblings. Whatever friends you can have being at his young age. And the Court also considers testimony in terms of the fact that [Cody] simply basically has no relationship with this child. He has only seen the child, it sounds like, on one occasion and very briefly."

12

¶ 39    Cody timely appeal from the orders finding that he was an unfit parent, and that Levi's best interest warranted the termination of his parental rights.

¶ 40                                      II. ANALYSIS

¶ 41    The legal authority for the involuntary termination of parental rights in Illinois is found in the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) and in the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). See *In re J.L.*, 236 Ill. 2d 329, 337 (2010) (citing *In re E.B.*, 15 231 Ill. 2d 459, 463 (2008)). The procedural basis for the involuntary termination of parental rights is found in section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 2022)). The procedure involves two steps. With step one, the State must prove, by clear and convincing evidence, that the parent is an "unfit person" as defined by the Adoption Act. *Id.*; 750 ILCS 50/1(D) (West 2022); *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994). If the trial court finds that the parent is unfit, the process moves to step two. With step two, the State must prove, by a preponderance of the evidence, that it is in the child's best interest that the parent's rights be terminated. 705 ILCS 405/2-29(2) (West 2022); *In re J.L.*, 236 Ill. 2d at 337-38.

¶ 42    On appeal from a trial court's findings that a parent is unfit and that terminating the parental rights is in the child's best interest, the reviewing court must not retry the case but, instead, must review the trial court's findings to determine if the findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). The trial court's finding of unfitness is given great deference because it had the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). A decision is contrary to the manifest weight of the evidence if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence

13

presented. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 28 (citing *In re Joseph M.*, 398 Ill. App. 3d 1086, 1089 (2010)); *In re S.R.*, 326 Ill. App. 3d 356, 360-61 (2001).

¶ 43     In this case, Cody asserts that the trial court lacked personal jurisdiction over him; that he was not an unfit parent; and that the best interests of Levi M.P. did not warrant termination of his parental rights.

¶ 44                          A. Personal Jurisdiction

¶ 45     Termination of a parent's rights involves a fundamental liberty interest. *In re Dar. C.*, 2011 IL 111083, ¶ 60 (citing *In re M.H.*, 196 Ill. 2d 356, 363 (2001)). "Personal jurisdiction is the court's power 'to bring a person into its adjudicative process.' " *In re M.W.*, 232 Ill. 2d 408, 415 (2009) (quoting Black's Law Dictionary 870 (8th ed. 2004)). Whether a trial court obtained personal jurisdiction is a legal question reviewed on a *de novo* basis. *In re Dar. C.*, 2011 IL 111083, ¶ 60 (citing *In re Detention of Hardin*, 238 Ill. 2d 33, 39 (2010)). If the court lacks personal jurisdiction over a party, "any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." *In re M.W.*, 232 Ill. 2d at 414.

¶ 46     The Juvenile Court Act of 1987 (Act) provides the service of process procedure for a parent. See 705 ILCS 405/2-15, 2-16 (West 2022). After a petition is filed, the trial court is required to issue a summons with a copy of the petition attached. *Id.* § 2-15(1). This summons must be served "by any county sheriff, coroner or probation officer" by leaving a copy with the person named in the summons, or by leaving a copy at his or her usual place of abode with a family member or with any person who lives at the address and is over the age of 10, and then mailing a copy to the person named in the summons. *Id.* § 2-15(4), (5). The statute mandates that personal service must be made at least three days before the scheduled hearing. *Id.* § 2-15(5).

14

¶ 47    The Act provides two alternatives if personal service cannot be obtained—service by certified mail if personal service was not made "within a reasonable time or if it appears that any respondent resides outside the State" (*id.* § 2-16(1)), or service by publication (*id.* § 2-16(2)).

¶ 48    Section 2-16(2) of the Act "contemplates a trial court obtaining personal jurisdiction through service by publication *only* when the State has conducted a diligent inquiry to ascertain the respondent's location and last known address." (Emphasis in original.) *In re Dar. C.*, 2011 IL 111083, ¶ 64.

¶ 49    Our legislature did not define the term "diligent inquiry." *Id.* ¶ 65. The Illinois Supreme Court in *In re Dar. C.* quoted caselaw and a dictionary in stating that the standard for a diligent inquiry was " 'that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make' " (*id.* (quoting *In re Sheltanya S.*, 309 Ill. App. 3d 941, 956 (1999))) and " 'characterized by steady, earnest, attentive, and energetic application and effort in a pursuit' " (*id.* (quoting Webster's Third New International Dictionary 633 (1993))). The court concluded in *In re Dar. C.* that the State failed to make a diligent inquiry by merely entering the respondent's name into various computer databases and then mailing letters to addresses located in the databases, and thus, service by publication was inappropriate.

¶ 50    Here, there is no question that DCFS complied with the statutory requirement and its own procedures before serving Cody by publication. However, the record also indicates that Cody was personally served eight weeks before the fitness hearing. Cody argues that DCFS did not do enough of a background search prior to attempting to serve him and then proceeding to service by publication. Although he acknowledges that he was personally served, his attorney argues: "By the time he received actual notice and became involved, the proceedings were at their final stage, and the die was essentially cast."

15

¶ 51    Based upon the factual DCFS reports in the record, Cody lacked permanent housing. He had a mobile housing setup, alternatively described as a fifth wheel or a trailer. DCFS could only know where Cody parked his trailer if he informed his caseworker. Cody chose to stop contacting his caseworker in April 2024. Then, when the case progressed to the point where the State filed its termination petition, no one knew where Cody was living. Regardless, DCFS attempted to locate him, and attempted personal service. Complicating the search was Cody's repeated arrests that resulted in stints in multiple county jails. As Cody had moved, DCFS's efforts to serve him at various addresses were ineffective, and the State's strategy shifted to monitoring Cody's court appearances to personally serve him. Ultimately, Cody was personally served at one of his criminal case court appearances.

¶ 52    Although we find that Cody was properly served in person and by publication, we also find that the trial court had personal jurisdiction because he voluntarily appeared at both the March 1, 2024, shelter care hearing and the May 9, 2024, adjudicatory hearing. *In re S.P.*, 2019 IL App (2d) 180476, ¶ 34. Section 2-15(7) of the Act provides: "The appearance of *** a person named as a respondent in a petition, in any proceeding under this Act shall constitute a waiver of service of summons and submission to the jurisdiction of the court ***." 705 ILCS 405/2-15(7) (West 2022). "Once personal jurisdiction over a parent is obtained, that jurisdiction continues until the matter is resolved." *In re M.W.*, 232 Ill. 2d at 428-29. Cody appeared at the shelter care hearing via Zoom. The court asked Cody if he had received the petition. He stated that he was unsure. Mother told the court that they had just received "new information and *** paperwork." A DCFS investigator present for the hearing informed the court that a nurse told her that she was taking paperwork received from DCFS via fax to Cody and Mother. The court told Cody that if he did not have the petition, it would make certain that he received a copy. The court then read the petition verbatim

16

during the hearing. We note that Cody does not claim that he did not have a copy of the petition for adjudication of wardship at the shelter care hearing. If the record is silent about whether a parent received a copy of the petition, the court must presume that he received a copy. *In re S.P.*, 2019 IL App (3d) 180476, ¶ 35 (citing *In re N.B.*, 191 Ill. 3d 338, 345 (2000)).

¶ 53 Cody also appeared at the adjudicatory hearing on May 9, 2024, accompanied by his court-appointed attorney. The record establishes that he was served with summons before that hearing. At that hearing, Cody stipulated to the allegations in the petition for adjudication of wardship. Therefore, even if somehow the court lacked personal jurisdiction over Cody at the shelter care hearing, the court had personal jurisdiction over him at the adjudicatory hearing. As personal jurisdiction over a parent continues until the conclusion of the case (*In re S.P.*, 2019 IL App (3d) 180476, ¶ 37 (citing *In re M.W.*, 232 Ill. 2d at 428-29)), personal service of summons when the State filed its termination petition was not required.

¶ 54 We conclude that the trial court had personal jurisdiction over Cody.

¶ 55                                   B. Parental Fitness

¶ 56 We first review the evidence to determine if the State met its burden of proving, by clear and convincing evidence, that Cody was an "unfit person." The trial court determined that the State met its burden of proof on the following basis: failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2022)).

¶ 57 The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three separate segments—interest or concern or responsibility—"may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012); *In re Richard H.*, 376 Ill. App. 3d 162, 166 (2007)). To determine if a parent has shown a reasonable degree of interest, concern, or

17

responsibility for a minor's welfare, the court "considers the parent's efforts to visit and maintain contact with the child as well as other indicia, such as inquiries into the child's welfare." *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). The court can also consider evidence that the parent completed his or her service plan as establishing the parent's interest, concern, or responsibility. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1065). A parent's effort is more important than a parent's success with the service plan objectives. *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). "In this regard, the court examines the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d at 278). "We are mindful *** that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064).

¶ 58    On appeal, Cody argues that he showed "interest and attempt[ed] to assume responsibility, to the extent made possible by his knowledge and circumstances, and that any lapses in involvement were largely attributable to factors other than a lack of concern on his part."

¶ 59    The trial court noted the broadness of the "interest, concern, or responsibility" category, and concluded that Cody did not exhibit interest, concern, or responsibility in this case. The court stated that Cody had the ability to demonstrate these factors if he had engaged in services. From DCFS's filed reports, the court found that Cody failed to engage in services. Cody completed a parenting program. However, he did not participate in an integrated assessment, and then failed to engage in the substance abuse, mental health, and domestic battery services DCFS required. Additionally, the court found support for its finding that Cody was an unfit parent for several additional bases: (1) he was not present for Levi's birth; (2) he did not participate in DCFS's

18

administrative case review; (3) his lack of communication with DCFS throughout this case; (4) his failure to show at 2024 court proceedings in June, August, and November; (5) his failure to appear for mandated drug screens; (6) his failure to speak to his caseworker at the December 2024 hearing; (7) his failure to inquire about services or visitation after April 2024; and (8) his failure to provide clothing, financial support, or presents to Levi throughout the pendency of this case.

¶ 60 We must give great deference to the trial court's finding of unfitness as the court was able to evaluate the demeanor and testimony of Cody and DCFS caseworker Brooke Copher. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re Daphnie E.*, 368 Ill. App. 3d at 1064). Cody's failure to contact DCFS about the status of his case, failure to engage in any services required except for parenting classes, and his failure to submit to the mandated drug screens amply established Cody's lack of interest, concern, and/or responsibility for Levi. Accordingly, we find that the trial court's finding on this ground is not contrary to the manifest weight of the evidence. *In re M.I.*, 2016 IL 120232, ¶ 21; *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31 (citing *In re A.W.*, 231 Ill. 2d at 104).

¶ 61 C. Best Interest of Levi

¶ 62 Termination of a parent's rights is a difficult and final step. *In re Adoption of Syck*, 138 Ill. 2d at 274-75. Parents maintain the important right to raise their own children. *Id.* However, when a parent has been declared "unfit," "the parent's rights must yield to the child's best interest." *In re Tashika F.*, 333 Ill. App. 3d 165, 170 (2002); *In re J.L.*, 236 Ill. 2d at 337-38. The interests of the parent and the child remain concurrent "to the extent that they both 'share a vital interest in preventing erroneous termination of their natural relationship' " until the court declares that the parent is unfit. *In re D.T.*, 212 Ill. 2d 347, 363 (2004) (quoting *Santosky v. Kramer*, 455 U.S. 745, 760-61 (1982)).

19

¶ 63    At the best-interest hearing, the State must establish proof that termination of a parent's rights is in the child's best interest by a preponderance of the evidence. 705 ILCS 405/2-29(2) (West 2022); *In re D.T.*, 212 Ill. 2d at 366. We review the trial court's best-interest decision with the manifest weight of the evidence standard. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009); *In re S.J.*, 368 Ill. App. 3d 749, 755 (2006). A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re Daphnie E.*, 368 Ill. App. 3d at 1072. On appeal from an order terminating a parent's rights, the reviewing court gives great deference to the trial court's decision because the trial court was in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000).

¶ 64    "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court must analyze several factors within "the context of the child's age and developmental needs" when considering if termination of parental rights serves a child's best interest. 705 ILCS 405/1-3(4.05) (West 2022). Those factors include:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

20

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

¶ 65    The trial court is not required to make an explicit finding on each of the best-interest factors. *In re Ca. B*., 2019 IL App (1st) 181024, ¶ 33 (citing *In re Tajannah O*., 2014 IL App (1st) 133119, ¶ 19); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (citing *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 424 (1991)). Another factor the trial court may consider is the likelihood of adoption. *In re Tashika F*., 333 Ill. App. 3d at 170.

¶ 66    During the best-interest hearing, DCFS caseworker Copher testified that Levi was thriving in his foster placement. He had lived with his current foster family for almost one year, having been placed with this family after he was discharged from the hospital. Copher testified that Levi was bonded with his foster parents; his sister Olivia had just been adopted by his foster family; and the family planned to move forward with Levi's adoption if Cody's parental rights were terminated.

21

¶ 67    We find that the trial court carefully reviewed and considered the best-interest factors before concluding that termination of Cody's parental rights was appropriate. The record clearly establishes that termination of Cody's parental rights was the appropriate outcome for Levi, and we conclude that the trial court's order terminating Cody's parental rights was not contrary to the manifest weight of the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 68                                   III. CONCLUSION

¶ 69    For the foregoing reasons, we affirm the judgment of Williamson County circuit court.


¶ 70    Affirmed.